600 P.2d 1212

**CITIZENS BANK, Plaintiff-Appellee,**

v.

**C & H CONSTRUCTION & PAVING COMPANY, INC., et al., Defendants-Appellants,**

v.

**FIDELITY NATIONAL BANK, Intervenor,**

v.

**James C. DAVIS, Third-Party-Defendant, Appellant.**

No. 3623.

Court of Appeals of New Mexico.

Aug. 28, 1979.

Writ of Certiorari Denied.

Joseph Goldberg, David A. Freedman, Freedman, Boyd & Daniels, Albuquerque, for defendants-appellants.

John S. Catron, Santa Fe, for plaintiff-appellee.

## OPINION

SUTIN, Judge.

This proceeding arises from a controversy surrounding the distribution of the judgment in *Citizens Bank v. C & H Const. & Paving Co., Inc.*, 89 N.M. 360, 552 P.2d 796 (Ct.App.1976) as modified in 90 N.M. 208, 561 P.2d 481 (1977).

In this proceeding, James C. Davis, C. R. Davis and Alice Davis (Davises) represented by Thomas Horn, their attorney recovered judgment against Citizens Bank in the sum of $349,998.04. Thomas Horn claimed a contingent fee of $116,666.01 plus interest and sought by motion to establish and enforce a lien on Davises' judgment. The Davises moved to cancel Horn's lien. After an evidentiary hearing, the district court granted Horn's motion and denied Davises' motion.

Horn was awarded judgment in the sum of $116,666.01 plus interest of $15,665.43 for a total of $132,331.44 as of March 25, 1978, and the motion to enforce the lien was granted. The judgment also denied Davises' motion to cancel the lien. The Davises appeal. We affirm.

The trial court found in part that the original fee agreement required the Davises to pay $35.00 per hour on a monthly basis, and the Davises did not comply; that the original fee agreement did not contemplate an appeal. On June 2, 1975, Horn and the Davises, by mutual consent, modified the fee agreement and entered into a contingent fee contract whereby Horn agreed to represent the Davises on appeal for one third of the amount of the recovery by the Davises against Citizens Bank; that Horn did not agree to "kick-back" or "refund" any portion of his fees; that the contingency fee agreement was not unreasonable or unconscionable and was a reasonable fee agreement under the circumstances.

The trial court concluded that the contingency fee contract was reasonable and valid and entitled Horn to a one-third fee plus accrued interest upon the gross amount of the recovery, not subject to a set-off in favor of Citizens Bank; that the contract was enforceable by an attorney's charging lien, superior to all other claimants, effective from the time of commencement of Horn's services.

No challenge was made to the court's findings 7 and 10:

> 7. On June 2, 1975, Horn and the Davises, *by mutual consent,* modified the fee agreement to provide for attorney fees of one-third of the amount of the recovery by the Davises against Citizens Bank, for Horn to continue to represent the Davises throughout the appellate process, and for crediting all amounts paid by the Davises against the amount of the contingency fee if the verdict were upheld on appeal.

> 10. C. R. Davis and James C. Davis are sophisticated business persons. *C. R. Davis has dealt with lawyers repeatedly over the years and was well aware of the terms of the attorney fee contract* executed by himself and James C. Davis on behalf of themselves and Alice Davis. [Emphasis added.]

In February, 1975, prior to trial, the Davises agreed to pay Horn a trial fee based upon an hourly rate, payable monthly. After trial, on May 26, 1975, the amount of the fee due and owing was $4,194.07. The Davises were unable to pay.

The jury returned a verdict of approximately $350,000.00 in favor of the Davises. From the moment the large verdict was returned, it was certain that an appeal would be taken by Citizens Bank. In the discussion that took place, C. R. Davis disclosed the unfortunate financial condition of the Davises, a matter of grave concern. The Davises were unable to pay the attorney fees to date or to pay substantial monthly billings during the appeal. After discussion with a district judge, Horn asked C. R. Davis if he would want to modify the agreement and proceed on a contingency basis, one that Davis had first suggested at the inception of the attorney-client relationship.

Davis "was very anxious to do that. He wanted to do that." Davis said, "I am generous and I have no objection to your making money on that." "You did a hell of a job in this case. You are the fifth lawyer we have had on the case, and you have had to fight everybody and you got a third of a million-dollar judgment."

Horn then discussed this fee arrangement with his law partner and after strong disagreement, Horn presented to the Davises his partner's proposition that the current attorney fees then due, be paid; that the appeal be handled on a contingency fee basis, and, if successful on appeal, the contingency fee would be credited with the amount paid for services in the trial of the case. The Davises agreed. On June 2, 1975, two days after the jury verdict, by mutual consent, the agreement was executed in writing and constituted a modification of the former agreement.

Four months thereafter, as agreed, the Davises paid the balance due on the original fee arrangement. The Davises claim "the findings of the district court that the Davises did not comply with the fee arrangement for trial is wholly unsupported." We disagree. The trial court found:

> 5. The Davises did not comply with the fee arrangement *as agreed* and did not pay hourly billings on a monthly basis. [Emphasis added.]

The billings were delinquent at the time of trial and not paid in full for several months after the delinquency first occurred. These facts may disclose good intentions but not compliance with payment as agreed, nor payment on a monthly basis.

The finding of the trial court was merely an introduction to reasonableness of the contingent fee arrangement.

The Davises state their position succinctly as follows:

> . . . It is the contention of the Davises that the amount of the fee *exacted* by Horn from the Davises—measured either in dollars or as a percentage of the

recovery—was *so disproportionate to any reasonable value of the work he was to be compensated for* as to establish that the fee was unreasonably excessive and hence invalid as unconscionable.

\*　　\*　　\*　　\*　　\*　　\*

. . . It is the contention of the Davises that this Court should hold, *as a matter of law*, that one hundred sixteen thousand dollars is grossly excessive as a fee for defending a judgment on appeal. [Emphasis added.]

We read these contentions to mean:

(1) That Horn, with much effort, obtained from the unwilling Davises a contingency fee contract.

(2) That the fee was excessive because it was not in balance with what Horn should have earned for work done on the appeal; that the amount of the attorney fee was unconscionable as a matter of law.

The Davises carefully omit all facts which dispute their position. Horn did not "exact" the fee arrangement from the Davises. "Exaction" unfairly describes the circumstances under which the parties negotiated. The Davises freely and fragrantly as phlox contracted for the contingency fee arrangement with full knowledge and understanding. The Davises do not dispute the fact that they were sophisticated business persons; that C. R. Davis had dealt with lawyers repeatedly over the years and was well aware of the terms of the contingency fee contract. The contract contained the following:

> NOTE: This is your contract. It protects both you and your attorneys and will prevent misunderstanding. If you do not understand it or if it does not contain all the agreements you discussed, please call it to our attention.

This language is plain and clear. It requires no interpretation. The terms of the contract were never questioned. The Davises at all times knew and understood its contents. There was no misunderstanding.

The war began *after* the affirmance of the judgment on appeal, not before. The attack made on the large attorney fee earned was "hindsight," a view that cannot be countenanced. The Davises' only concern was affirmance on appeal of an exciting third of a million dollar judgment and it was affirmed.

Horn did not "exact" the contingency fee arrangement from the Davises.

We turn now to the question of whether the fee was unreasonably excessive as a matter of law for defending a case on appeal.

The Davises do not attack contingent fee contracts generally; nor do they argue that in all cases is a one-third contingent fee or a $130,000.00 fee unconscionable. Indeed, the Davises do not argue that in all cases is a one-third contingent fee unconscionable solely for appellate work. Rather, the Davises argue that in the peculiar and unusual circumstances in which this fee arose, the fee is unconscionably excessive; that the amount of the percentage should be reduced to that which would be an equivalent of the reasonable value of the work for which he was to be compensated. In effect, this is a return to the hourly rate. We disagree because the Davises view the amount of the attorney fee with disdain after affirmance of the Davises' judgment on appeal. It may be said with equanimity that but for Horn's success in sustaining an extraordinary judgment on appeal, the Davises would have plunged into economic despair, and Horn would have walked away empty handed.

What was the risk taken in the appeal?

The large judgment entered in favor of the Davises was not placed upon a strong and healthy pedestal. It appeared to be weak and sick and subject to an easy reversal.

Charles D. Olmsted, a trial and appellate attorney of note, was employed by Citizens Bank to carry the proceedings forward after the mandate was issued. He studied the case intensely. In complicated proceedings before the Supreme Court he strongly urged the court to exercise its power of "superintending control" to review the case

and reverse. When asked his opinion about the difficulty of the appeal, he said:

"I would not have wanted to take on . . . the appellees' [Davises] side of the appeal. My view in getting . . . the judgment reversed, with respect to the counterclaims and cross-claims of the Davises against Citizens Bank, would have been about as difficult as shooting fish in a barrel."

It was his opinion that it would have been "very easy" to reverse the case.

Raymond W. Schowers, then Horn's partner, discussed the contingency agreement with Horn on June 2, 1975. He objected violently with respect to modifying the original hourly rate agreement and said:

[I]t was my opinion, even after trial, that the chances of it being sustained on appeal were minimal and that we would probably end up with nothing again. . .

Russell Moore, another lawyer of renown in trial and appellate work, was familiar with this case. He represented Citizens Bank in a companionate case. In his opinion, the case would be reversed.

Olmsted, Moore and William H. Carpenter, also an attorney experienced in trial and appellate work, all testified that the contingency fee arrangement was reasonable and proper. Carpenter testified that a 50% contingency fee arrangement would be excessive, not 33⅓%; that the contract should be honored when the Davises knew and understood the modification of the hourly-rate contract and consented thereto.

There is a distinct difference in risk between having an appeal sustained if the judgment rests on solid factual grounds dealing with well-accepted legal principles in which the risk is minimal, and having an appeal sustained in which the converse is true and the risk is maximum. Horn felt that this appeal was a "long shot" and Schowers thought it was a "dog."

The risk involved was immense.

In addition to the risk involved, the Davises and Horn dealt at "arm's length" from the inception of the attorney-client relationship forward.

Before an attorney undertakes the business of a client, the parties deal with each other at "arm's length." No confidential relationship then exists. A person with business acumen and experience cannot claim ignorance or incompetency to negotiate a contract at "arm's length" with an attorney. *Pocius v. Halvorsen,* 40 Ill. App.2d 162, 189 N.E.2d 358 (1963), reversed on other grounds, 30 Ill.2d 73, 195 N.E.2d 137 (1964), 13 A.L.R.3d 662 (1967); *Lee v. Gump,* 14 Cal.App.2d 729, 58 P.2d 941 (1936); *Hansel v. Norblad,* 78 Or. 33, 151 P. 962 (1915). In the instant case, the original hourly-rate fee contract resulted.

After the attorney-client relationship was born, the position of the Davises and Horn did not change. The parties modified the attorney fee contract with "mutual consent." "Mutual consent" means that a meeting of the minds of the parties existed and that the agreement in its written form expressed what was really intended by the parties. Indeed, the Davises had requested at the inception of the relationship that Horn take the case on a contingent fee basis. C. R. Davis was an above average intelligent person in the business field, one who understood the negotiations regarding the contingency fee. He had dealt with many lawyers over the years and was aware of and understood the terms of the contract. The Davises and Horn were each in position to negotiate a fee arrangement in good faith, to present and discuss proposals for the purpose of persuading or being persuaded by logic and reason. In fact, the Davises and present appellate lawyers entered into a contingency fee-hourly rate arrangement dependent upon the outcome of this appeal.

The Davises did not need independent advice. They knew every circumstance affecting the contingency fee arrangement. They knew the nature and the amount of the attorney fee. They were intelligent men able to comprehend the nature, quality and consequences of the contract. There was nothing for Horn to disclose. The Davises were competent contracting parties

who knew and understood the fee arrangement and all the circumstances surrounding it. The Davises stood in no different relationship with Horn than they would with any other party. Horn did not exercise undue influence, mislead the Davises or practice deceit. He negotiated the contract fairly with his cards face up on the table. *Hansel, supra,* says:

> . . . Even after the confidential relation is established the authorities agree that, if all the facts were known to the client, and he was fully advised of the situation, if no attempt was made to mislead or deceive him to his hurt, *and if he knowingly and understandingly entered into the agreement, it is as binding upon attorney and client as it is upon any other individuals competent to contract. . .* [Emphasis added.] [151 P. 965.]

The Davises say: (1) Horn failed to disclose that he would have represented the Davises on appeal under virtually any fee arrangement and (2) that in becoming a substantial claimant against the judgment, Horn would be placed in an inevitable conflict with the Davises in settlement negotiations with creditors. This matter is foreign to this appeal and unrelated to the contingency fee arrangement.

Nevertheless, to argue that C. R. Davis was ignorant of these facts, facts essentially immaterial in the formation of the contract, is to reduce his intelligence to a state of incompetency. C. R. Davis knew every available alternative fee arrangement and did not suggest or request any other type of payment for services rendered in the appeal. With reference to any "inevitable conflict with the Davises in settlement negotiations," C. R. Davis was as knowledgeable as Horn.

The parties were dealing at "arms length."

We are not involved with a transaction between attorney and client in which an attorney acquires property from a client. In this situation, the attorney must show that he made a full and frank disclosure of all relevant information that he had and that the client had independent advice.

Such contracts will be closely scrutinized by the courts. When a client challenges the fairness of such contract, the attorney has the burden of showing not only that he used no undue influence but that in every particular he acted honestly and in good faith. *Van Orman v. Nelson,* 78 N.M. 11, 427 P.2d 896 (1967).

■ In independent commercial transactions between attorney and client, we strongly emphasize that an attorney owes a high degree of fidelity, complete unselfishness and inflexible loyalty to the interest of his client. This duty stems from human fraility when confronted with conflicting interests, evidenced by the centuries-old scriptural passage: "No man can serve two masters." We emphasize that this duty is something stricter than the morals of the marketplace. There is no shadowy borderline or twilight zone. Only by this uncompromising rigidity has the rule of undivided loyalty been maintained. As a result, the "arm's length rule" applicable in ordinary business transactions is totally inapplicable in business dealings between attorney and client.

■ But we must not say that the fiduciary rule is applicable to a fee contract absent the requirements of trust, confidence, and a duty of disclosure.

■ Furthermore, in New Mexico, a standardized, unambiguous contingency fee contract is not subject to alteration or amendment by a court. In any event, there should not be trial court contract fee fixing. The amount of the contract fee would vary with every judge. It is the function of the court to enforce the contract as made. Where the intent of the parties is to pay an attorney one-third of all money and property recovered by the client, judgment must be entered for the attorney. *In Re Will of Carson,* 87 N.M. 43, 529 P.2d 269 (1974). This rule stands unchallenged in this appeal. In *Walters v. Hastings,* 84 N.M. 101, 500 P.2d 186 (1972), a contingency fee contract was interpreted favorably to protect the lawyer. A client claimed justification for discharge of the lawyer to avoid pay-

ment of a fee and the court said that to prevail the burden was on the client to prove some shortcomings in the attorney's professional activities by testimony of a lawyer. The court quoted the following with approval from the case of *Dolph v. Speckart,* 94 Or. 550, 186 P. 32 (1920):

> ". . . Where one employs an attorney and makes an express valid contract, stipulating for the compensation which the attorney is to receive for his services, such contract is generally speaking, conclusive as to an amount of such compensation. . . ." [84 N.M. at 108.]

We hold that a contingency fee arrangement of 33⅓% of recovery is not excessively unreasonable or unconscionable in taking an appeal when the parties deal at arm's length, the risk is great, the fee arrangement is clear and unambiguous and supported by expert testimony that the percentage is reasonable.

We agree with the Davises that the rule stated in *Randolph v. Schuyler,* 284 N.C. 496, 201 S.E.2d 833, 837 (1974), is generally accepted:

> . . . The generally accepted view appears to be that a contract made between an attorney and his client, during the existence of the relationship, concerning the fee to be charged for the attorney's services, will be upheld if, but only if, it is shown to be reasonable and to have been fairly and freely made, with full knowledge by the client of its effect and of all the material circumstances relating to the reasonableness of the fee. The burden of proof is upon the attorney to show the reasonableness and the fairness of the contract, not upon the client to show the contrary. . . .

See, Annot., *Validity and effect of contract for attorneys compensation made after inception of attorney-client relationship,* 13 A.L.R.3d 701 (1967).

This rule applies to contingency or hourly-rate fees charged a client. In the instant case, the burden imposed on Horn was successfully lifted. The *Randolph* Rule does not relate reasonableness to the reasonable value of work to be performed on appeal by the attorney.

The Davises rely on *Budagher v. Sunnyland Enterprises, Inc.,* 90 N.M. 365, 563 P.2d 1158 (1977), Justice Sosa, dissenting. A real estate mortgage note provided for payment "with 10 per cent (10%) additional on amount unpaid should this note be placed in the hands of an attorney for collection." The court held that one who seeks a personal judgment is only entitled to collect, in addition, a reasonable attorney fee based upon the evidence presented. The court said:

> . . . Since such a clause is generally considered an indemnification provision, the payee is only entitled to a reasonable fee for the legal services rendered. [90 N.M. at 367.]

A mortgage note contract has no indicia that resembles an attorney-client contingency fee contract.

The Davises seek to change the law of New Mexico. They seek the establishment of a rule of law that if the amount of the fee arrangement is so disproportionate as to any reasonable value of the work to be compensated for, the fee is unreasonably excessive. *Gair v. Peck,* 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43, 77 A.L.R.2d 390 (1959) and *Anderson v. Kenelly,* 37 Colo. App. 217, 547 P.2d 260 (1976).

*Gair* held that the appellate division had the power to adopt a rule limiting contingent fees in claims and actions for personal injury and wrongful death ranging from 50 to 25 percent, depending upon the amount received, and further providing that the court would make special allowance for larger compensation in cases involving extraordinary circumstances. In the course of its opinion, the court said:

> . . . Contingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered. . . . [188 N.Y.S.2d at 497, 160 N.E.2d at 48.]

This statement may be applicable under the New York Rule. The New York Rule

adopted did not fix fees but rather served to allocate the burden of proof. Any fee below the stated limits is presumed reasonable without the necessity of proof, whereas fees in excess of the limits must be justified by the attorney. *Gair's* isolated statement bears no relationship to the law of New Mexico.

In *Anderson,* the trial court exercised its inherent power to reduce an attorney fee where the contingency fee arrangement under the circumstances was obviously unfair. The work of the attorney required little skill or effort in obtaining the correct date of enlistment of an insured in the military service. This information resolved the dispute over payment of proceeds under an employee's group life policy affording coverage for accidental death. We have no quarrel with *Anderson,* but to compare it with the instant case, is to compare "lightning bug with lightning." We do think it important to state the deep respect of the Colorado court for the contingency fee contract. It said:

> Defendant argues at length that if we uphold the action of the trial court, we are sounding the death-knell of contingent fee arrangements between attorney and clients. We disagree. While the uninformed frequently cast aspersions on contingent fee contracts, nevertheless, such fee arrangements are frequently the only way in which people of modest means may secure legal representation in certain types of litigation. *Often it is the best fee arrangement for any litigant where recovery is truly in doubt. See Code of Professional Responsibility EC2–20.* Rather than destroying the contingent fee contract, curtailing abuses thereof, as the trial court did here, will serve to answer critics and will help assure its continued use in proper cases to the benefit of litigants, the bar, and the ends of justice. [Emphasis added.] [547 P.2d at 261.]

*See,* Rules 2–106 and 5–103 of the New Mexico Code of Professional Responsibility.

Extensive authority has been cited which hold that the review by an appellate court is an independent review; that appellate judges have expert knowledge as to the reasonable value of legal services. *Herro, McAndrews & Porter, S.C. v. Gerhart,* 62 Wis.2d 179, 214 N.W.2d 401 (1974). This is an exception to the general rule related to our respect for the trial court's findings. Even if we adopted this rule, we would unhesitatingly say that under the facts and circumstances of this case, the contingency fee contract was fair and reasonable.

We hold that the contingency fee arrangement was not unconscionable or unreasonable.

The Davises take the position that the conclusion of the district court that the contingent fee arrangement was not procured through fraud is erroneous; that it is contrary to law. and unsupported by substantial evidence.

We have examined the conclusions of the district court and Davises' Brief-In-Chief. We find no such conclusion reached, and none have been referred to. The only finding pertinent to this issue is finding No. 9:

> 9. At no time did Mr. Horn agree to "kickback" or "refund" any protion [sic] of his fees to his clients.

This finding was not challenged. Fraud is not an issue in this appeal. Furthermore, any conclusion reached in the decision of the trial court must find support in the findings of fact. If such a conclusion were made, it is so supported.

The Davises contend that: "The District Court was clearly in error in refusing to find that Horn failed to disclose material facts and in refusing to rule that Horn procured the contingent fee agreement through fraud." We do note that the Davises requested a finding and conclusion on this subject matter. The failure to make the finding is a finding against the Davises. We have heretofore held that the "disclosures" not made were not relevant or material to reasonableness of the contingency fee contract. The same ruling is made on the subject of fraud.

The contingent fee arrangement was not procured through fraud.

The Davises claim that the gross amount of the recovery was subject to a set-off in favor of Citizens Bank.

The trial court found and concluded:

14. Citizens Bank obtained judgment and attorney fees in this action against C. R. Davis and Alice Davis in the sum of $63,396.04, and said amount is entitled to be set-off against the Davises' judgment.

* * * * * *

3. The contingency contract entitled Horn to a one-third fee upon the gross amount of the recovery, and the amount of one-third of the gross recovery representing Horn's attorney fee is not subject to the set-off in favor of Citizens Bank.

The Davises claim that Horn's fee should be limited to one-third of the net judgment; that the conclusion of the trial court was contrary to law.

The contingent fee arrangement granted to Horn a fee of "Thirty-Three and One-Third Percent (33⅓%) of any settlement, *verdict,* or recovery." [Emphasis added.]

The jury returned verdicts totalling $349,998.04. This was the "gross amount" of the recovery.

The Davises argue that the set-off in favor of Citizens Bank was known to the parties at the time the contingent fee agreement was executed. Therefore, the language of the contract should be construed to mean a one-third contingency on *net* recovery. The logic and reason of this argument is faulty. With knowledge of the set-off, the parties agreed with no misunderstanding that *the verdict of the jury* was a basis for fixing the attorney fee. "Recovery" was an alternative, and "net recovery" a useless appendage raised for the first time on appeal. One-third of "any verdict" is unambiguous. We need not refer to those cases cited which construe ambiguous provisions in a contract in favor of the client.

"A contingent fee contract is based on the recovery, not the amount of the verdict (unless it specifically so provides)." *Cox v. Cooper,* 510 S.W.2d 530, 538 (Ky.1974). In Pennsylvania, contingency fee agreements are subject to supervision by the courts. In exercising control over legal fees, the amount of the contingent fee must be computed upon the assessment of actual recovery and not on the amount of the verdict rendered. *National Bank of Topton,* 190 Pa.Super. 501, 154 A.2d 252 (1959); *Almi, Inc. v. Dick Corp.,* 375 A.2d 1343 (Pa.1977). The origin of the Pennsylvania rule came from a rule stated in 6 C.J. *Attorney and Client,* § 322:

The percentage coming to the attorney is usually reckoned on the amount actually recovered, and not the amount of the judgment rendered, *unless the language of the contract is such as to justify such an interpretation.* . . . [Emphasis added.]

See *Diggs v. Taylor & Co.,* 329 Pa. 385, 198 A. 51 (1938), and *Wooldridge v. Bradbury,* 185 Ky. 587, 215 S.W. 406 (1919) cited therein. Of course, if the percentage is based on the amount actually recovered, it means net recovery, money actually received. It does not mean "gross recovery." Pennsylvania has translated "net recovery" to mean the "net amount of the verdict" rendered. A "verdict" rendered does not have the same connotation as "judgment" rendered. It contemplates a larger sum than a judgment rendered with a set-off. Had it been the intention of the parties to limit Horn to 33⅓% of the "net recovery" or "net amount of the verdict" rendered, it was a simple matter to so express it. Placing ourselves as nearly as possible in the position they occupied when the contract was made for the purpose of ascertaining what they meant by what they said, we are disposed to think the parties intended that 33⅓% of the gross amount recovered from the Citizens Bank should be paid to Horn. This was the construction placed upon the contract, and we hold it was right. *Funk v. Mohr,* 185 Ill. 395, 57 N.E. 2 (1900).

The attorney who tried and appealed this case is now a member of this Court. To dispel any misgivings about the result arrived at, we took a route independent of the Answer Brief filed. It is not the intention of this opinion to deflate the inexorable

duties of an attorney or the rights of a client. We did not view the Davises' position with antagonistic eyes. "It is hornbook law that the decision of a trial court will be upheld if it is right for any reason." *Scott v. Murphy Corporation,* 79 N.M. 697, 700, 448 P.2d 803 (1968). Our duty is to respect the views of a trial judge who looked with favor upon the success of a lawyer. We should not look askance at the work of a lawyer because he is a member of our profession. The function of this Court is to see that justice is done according to law and to give authoritative expression to the developing body of the law in order to elevate the dignity of the judiciary and the legal profession in the public eye. This we believe we have done.

Affirmed.

IT IS SO ORDERED.

HERNANDEZ, J., concurring in result.

ANDREWS, J., dissenting.

ANDREWS, Judge (dissenting).

I dissent.

The trial court has concluded (1) that "[t]he contingency fee contract between the Davises and Horn is reasonable and valid;" (2) that "[t]he contingency contract entitled Horn to a one-third fee upon the gross amount of the recovery, and the amount of one-third of the gross recovery representing Horn's attorney fee is not subject to the set-off in favor of Citizen's Bank;" (3) that "[t]he attorney's charging lien is superior to and has first priority over all other claimants, relating back and taking effect from the time of commencement of Horn's services;" and (4) that "Horn shall recover one-third of $349,998.04 plus interest earned thereon as his attorney's fees herein," or $116,666.01. I disagree.

*Budagher v. Sunnyland Enterprises, Inc.,* 90 N.M. 365, 563 P.2d 1158 (1977), interpreting a mortgage note contract, establishes that, in New Mexico, when the reasonableness of attorneys' fees is challenged, it is incumbent upon the court to determine the *value of the services rendered.* In this case, the trial court found that the contingency fee agreement was not unreasonable nor unconscionable but "was a reasonable fee agreement under the circumstances." Apparently this finding refers to the fact that, since the Davises had not complied with the fee arrangement for the trial and had not paid hourly billings on a monthly basis, where the original fee agreement did not contemplate an appeal, the modification of the agreement after the judgment created unique "circumstances" justifying this arrangement. I agree that a contract for attorneys' compensation made during the existence of the attorney-client relationship is unique; but in my opinion such uniqueness qualifies the transaction for closer scrutiny by the courts, and is valid and enforceable only if fair and equitable. *See* Anno. "Validity and Effect of Contract for Attorney's Compensation Made After Inception of Attorney-client Relationship." 13 A.L.R.3d 701.

In the instant case the trial court found that the fee was reasonable. The issue on appeal, then, is whether such finding is supported by substantial evidence. This issue alone should be discussed,[1] with a decision as to whether the standard in *Randolph v. Schuyler,* 284 N.C. 496, 201 S.E.2d 833 (1974) should be followed. To flatly denounce the "Randolph" rule and announce that reasonableness and the reasonable value of work to to be performed are distinguishable concepts is to avoid the issue presented by this appeal, and is contrary to *Budagher.* Following the "Randolph" rule, my review of this evidence leads me to conclude that the attorney did not meet his burden in showing that the attorney fee is unreasonably excessive.

The position of the Davises and Horn *did* change "[a]fter the attorney client relationship was born," and the Davises do stand in a different relationship with their attorney

---

1. We should not as appellants suggest, make an independent review of the reasonableness of the fee.

than they do with any other party. This contingent fee contract was entered into *after* the trial, while the client, an appellee, was deeply indebted to the lawyer. This fact presents an element of coercion which colors the entire transaction. The trial court found that in "his defense of the judgment on appeal, Horn filed all necessary pleadings including a thirty-nine page brief in the Court of Appeals." This finding alone suggests an upper limit on the reasonable value of services rendered, which, in my opinion, does not support an award of $116,000 in attorneys' fees.

I agree that there is substantial evidence in the record to suggest that the chances for a successful defense of the judgment on appeal were small, and that this is a factor which is to be considered in determining whether the fees charged were reasonable. *Schafer v. Knuth,* 309 Mich. 133, 14 N.W.2d 809 (1933), *Oxborough v. S. T. Martin,* 169 Minn. 72, 201 N.W. 809 (1926). However, the probability of success in any legal action is not subject to precise quantification; and since the attorney bears the burden of showing that the fee is reasonable, such uncertainty must be resolved in favor of the client. An award of fees which is many times greater than the reasonable value of the services performed cannot be supported by any subjective evaluation of the case as being a "long shot" or a "dog."

As to the set-off issue, *Forrest Currell Lumber Company v. Thomas,* 82 N.M. 789, 487 P.2d 491 (1971), contains the basic rule for an attorney's charging lien and its priority:

The lien of an attorney for services rendered in an action *relates back to, and takes effect from, the time of the commencement of the services,* when it attaches to a judgment, it is superior to the claim of a creditor in whose favor execution has been levied, or to a subsequent attachement, garnishment, or trustee process, or other liens on the money or property involved, *subsequent in point of time.* [Quoting *Hannah Paint Mfg. Co. v.*

*Rodey, Dickason, Sloan, Akin & Robb,* 298 F.2d 371 (10th Cir. 1962).] [Emphasis added.]

Applying the rule of the *Thomas* case here, we have a situation in which the original verdict and the bank's set-off are prior in time to the fee agreement on which the attorney is suing. If the charging lien relates back in time to the commencement of the services, this lien goes back only to the time of the appeal since only the appellant services are covered by the agreement under which Horn is seeking his charging lien. Therefore, the set-off can be said to have attached to the judgment prior to the origination of any claim by the attorney and is therefore superior to it. *See Fidelity National Bank v. Great American Insurance Co.,* No. 76–2125–26 (10th Cir. June 19, 1978).

Whether the test is one of reasonableness or reasonable value of services rendered, this contract should fail. As stated by the Texas Supreme Court in *Archer v. Griffith,* 390 S.W.2d 735, 739 (Tex.1964):

The relation between an attorney and his client is highly fiduciary in nature, and their dealings with each other are subject to the same scrutiny, intendments and imputations as a transaction between an ordinary trustee and his cestui que trust. "The burden of establishing its perfect fairness, adequacy, and equity, is thrown upon the attorney, upon the general rule, that he who bargains in a matter of advantage with a person, placing a confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other." Story, Equity Jurisprudence, 7th ed. 1857, § 311.