# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  February 2, 2016

**NO. 34,108**

**RAY CASTILLO,**

      Plaintiff-Appellant,

v.

**JOSE LUIS ARRIETA, MANUEL ARRIETA,**
**THE ARRIETA LAW FIRM, P.C.,**
**and JOSE LUIS ARRIETA, P.C.,**

      Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Lisa B. Riley, District Judge**

Law Offices of Damon B. Ely
Damon B. Ely
Albuquerque, NM

Chapa Law Group, P.C.
Miguel J. Chapa
San Antonio, Tx

for Appellant

Miller Stratvert P.A.
Cody R. Rogers
Las Cruces, NM

for Appellees Manuel Arrieta and the Arrieta Law Firm, P.C.

Jose Luis Arrieta

Las Cruces, NM

Pro se Appellee

**OPINION**

**VANZI, Judge.**

{1}     In 2006 Plaintiff Ray Castillo signed a document with a provision requiring him to arbitrate "any dispute" arising between him and his attorneys, who are now defendants in this case. The present lawsuit—alleging legal malpractice and related claims—can only proceed to a jury trial if, as a matter of contract, the arbitration clause does not apply, or if it is otherwise unenforceable.

{2}     An arbitration clause in a fee agreement between attorney and client implicates unique legal and ethical concerns that are presently being debated, with other jurisdictions taking varied approaches to enforceability. *See generally* Terese M. Schireson, Comment, *The Ethical Lawyer-Client Arbitration Clause*, 87 Temp. L. Rev. 547, 557-64 (2015). For the reasons discussed in this Opinion, we hold that the plain text of this unusually broad arbitration provision reasonably applies to Plaintiff's malpractice claim, but that it is unenforceable if it was signed without Plaintiff's informed consent. We reverse the district court's decision compelling arbitration and remand for proceedings to determine the circumstances surrounding negotiation of the fee agreement.

# I.  BACKGROUND

{3}  On August 7, 2006, Plaintiff signed a contingency fee agreement with Jose Luis Arrieta and the Arrieta Law Firm, P.C., which Plaintiff alleges was then also the firm of Jose's brother and co-counsel, Manuel Arrieta. The representation was related to injuries Plaintiff allegedly suffered less than a month earlier in a work site accident—the severity of which is now disputed by the parties. This dispute, along with most other factual disputes raised in the briefs, is not relevant to our analysis.

{4}  The fee agreement at issue contains fourteen numbered paragraphs. The final numbered paragraph succinctly provides:

> **ARBITRATION CLAUSE:** Should any dispute arise, Client and Attorney agree to submit their dispute to arbitration.

Plaintiff signed the fee agreement, affirming that he "read the foregoing terms and agree[d] to them without reservation." There is no other language in the agreement that discusses the scope or meaning of the arbitration clause or provides any explanation of arbitration generally. There is no indication in the agreement that Plaintiff was waiving his right to a jury trial should he sue his attorney for malpractice. Nor is there any suggestion that Plaintiff seek advice of independent counsel before agreeing to such a waiver.

{5}  In 2013 Plaintiff brought this lawsuit against Jose, Manuel, and their law firms (collectively, Defendants), alleging that Defendants breached their obligations in the

2

fee agreement, breached an implied covenant of good faith and fair dealing, and committed legal malpractice resulting in Plaintiff's inability to present his personal injury case. When Defendants moved to compel arbitration, Plaintiff opposed the motion on grounds that the arbitration clause was ambiguous, did not clearly apply to a legal malpractice claim, and was otherwise unconscionable and unenforceable as a matter of public policy. With respect to enforceability, Plaintiff argued, in part, that an attorney has fiduciary obligations to his client, which includes an obligation to explain the meaning and scope of an agreement to arbitrate, including the relative advantages and disadvantages of prospectively giving up the right to a jury trial for any future malpractice claim.

{6} Plaintiff and Defendants submitted conflicting affidavits related to the circumstances surrounding negotiation of the fee agreement. According to Defendants, each paragraph was reviewed with and explained to Plaintiff before the agreement was signed. Specifically, the defense affidavit states that Plaintiff was told that any dispute arising from the representation "would be subject to arbitration through a neutral arbitrator selected by both parties." In contrast, Plaintiff's affidavit states that Defendants never discussed anything about arbitration with him and that he was never told that he would be waiving his right to a jury trial if he sued Defendants for malpractice.

3

{7}     Plaintiff sought leave to depose Defendants in order to investigate the factual dispute evinced by the affidavits. Without any evidentiary hearing, the district court—either believing the factual dispute to be irrelevant, or else resolving the dispute on the face of the conflicting affidavits—denied Plaintiff's request to conduct discovery and granted Defendants' motion to compel arbitration.

## II.    DISCUSSION

{8}     Plaintiff makes several related arguments on appeal, which we summarize as: (1) the arbitration provision, which was included in an agreement dealing primarily with attorney fees, does not clearly apply to the malpractice claim; and (2) enforcement of the provision violates public policy unless Plaintiff was sufficiently informed "of the details of the arbitration process and the pros and cons of arbitration," and given the opportunity to seek advice of independent counsel. "We review de novo the grant of the motion to compel arbitration in the same manner we would review a grant of a summary judgment motion." *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 4, 134 N.M. 630, 81 P.3d 573. As such, the question cannot be resolved as a matter of law if there remain disputed issues of material fact. *See Campbell v. Millennium Ventures, LLC*, 2002-NMCA-101, ¶¶ 13-14, 132 N.M. 733, 55 P.3d 429.

4

**A. The Legal Malpractice Claim Is Within the Scope of the Arbitration Clause**

{9} As an initial matter, we are asked to determine whether the arbitration provision relied upon is even intended to apply to Plaintiff's legal malpractice claim. *See Clay v. N.M. Title Loans, Inc.*, 2012-NMCA-102, ¶ 14, 288 P.3d 888 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (internal quotation marks and citation omitted)). "Under contract law, the scope of an arbitration provision—whether the parties intended to submit to arbitration—is determined by applying the plain meaning of the contract language." *Id.* (alteration, internal quotation marks, and citation omitted). The clause in this case is included in an agreement that deals primarily with attorney fees, and is broadly worded to apply to "any dispute" that may arise between the parties. Plaintiff considers this language to be ambiguous, and asks us to construe any ambiguity strictly against Defendants.

{10} "We construe ambiguities in a contract against the drafter to protect the rights of the party who did not draft it." *Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 14, 134 N.M. 558, 80 P.3d 495. But "[a]rbitration clauses such as the one before us are drafted with broad strokes and, as a result, require broad interpretation." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 55, 131 N.M. 772, 42 P.3d 1221. "When parties voluntarily contract to arbitrate their grievances, an order to

arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Horne v. Los Alamos Nat'l Sec., L.L.C.*, 2013-NMSC-004, ¶ 46, 296 P.3d 478 (alteration, internal quotation marks, and citation omitted); *see Heimann v. Kinder-Morgan CO2 Co., L.P.*, 2006-NMCA-127, ¶ 7, 140 N.M. 552, 144 P.3d 111 ("[A]mbiguity in arbitration clauses should be resolved to favor arbitration."). We will certainly not construe a broad but unambiguous arbitration clause in a manner counter to its plain text. *See Clay*, 2012-NMCA-102, ¶ 27.

{11}     However, our prior cases dealing with broadly worded arbitration clauses have still required *some* relationship between the dispute at issue and the general substance of the underlying agreement. *See id.* ¶ 14 ("In order to fall within the scope of the arbitration clause, the claims at issue must bear a 'reasonable relationship' to the contract in which the arbitration clause is found."); *Santa Fe Techs.*, 2002-NMCA-030, ¶ 52. Although the arbitration provision we examined in *Clay*—by its terms—applied only to matters that arose from or were related to the underlying agreement, we were nonetheless persuaded that "even the most broadly[]worded arbitration agreements still have limits founded in general principles of contract law," and that courts should "refuse to interpret any arbitration agreement as applying to

6

outrageous torts that are unforeseeable to a reasonable consumer in the context of normal business dealings." 2012-NMCA-102, ¶¶ 18, 22-23 (internal quotation marks and citation omitted).

{12} Thus, a party to even the most general arbitration agreement "may be assumed to have intended to arbitrate issues that are closely related to those governed by the agreement itself, but not those that are unrelated to the agreement, out of the context of the agreement, or outrageous and unforeseeable." *Id.* ¶ 20; *see Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995) ("[I]f two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, [it is] elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract.").

{13} The underlying agreement at issue in this case is styled as an "Attorney-Client Contingency Fee Agreement." It deals primarily with attorney fees—provisions regulating minimum deposits for litigation and costs, legal fees and billing practices, attorney's charging lien, and other such matters. But it also describes the scope of representation, discusses discharge and withdrawal, and disclaims liability for various issues. Importantly, Paragraph 2 contains the attorney's obligations to the client to "provide those legal services reasonably required to represent Client, and . . . take reasonable steps to inform Client of progress and to respond to Client's inquiries."

7

In short, the agreement, like any retainer agreement, broadly governs the attorney-client relationship and sets out various obligations between the parties.

{14} Plaintiff's complaint for legal malpractice is based on Defendants' "failing to pursue the proper entities, failing to preserve evidence, failing to diligently pursue the case, failing to properly communicate with the clients and otherwise acting in an unreasonable and negligent manner." In other words, and without requiring much abstraction, the gist of the complaint is that Defendants "failed to provide those legal services required to represent" Plaintiff, and failed to keep Plaintiff informed and respond to his inquiries—which are the same obligations described in Paragraph 2 of the fee agreement. Therefore, because the present dispute fairly implicates the rights and obligations described in the fee agreement, particularly the duties set out in Paragraph 2, we conclude that it would ordinarily be subject to the arbitration clause included in that same agreement. *See Clay*, 2012-NMCA-102, ¶ 20 ("A party may be assumed to have intended to arbitrate issues that are closely related to those governed by the agreement itself[.]"). Whether the arbitration provision may be enforced under the present circumstances is a separate question to which we now turn.

**B.** **The Arbitration Clause Is Unenforceable Absent Plaintiff's Informed Consent**

{15} "[A]rbitration agreements are contracts enforceable by the rules of contract law." *Horne*, 2013-NMSC-004, ¶ 16; *see* NMSA 1978, § 44-7A-7(a) (2001) ("An

8

agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties . . . is valid, enforceable[,] and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."). Contract provisions that are "grossly unreasonable and against our public policy under the circumstances" are not enforceable. *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 31, 146 N.M. 256, 208 P.3d 901. "Whether a contract is against public policy is a question of law for the court to determine from all the circumstances of each case[,]" considering both statutory and judicial expressions of public policy. *K.R. Swerdfeger Constr., Inc. v. Bd. of Regents, Univ. of N.M.*, 2006-NMCA-117, ¶ 23, 140 N.M. 374, 142 P.3d 962 (internal quotation marks and citation omitted).

{16}     Defendants argue that Plaintiff's failure to read and understand the document he signed is no defense to its enforcement. *See Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 1982-NMSC-102, ¶ 13, 98 N.M. 541, 650 P.2d 825 ("Each party to a contract has a duty to read and familiarize himself with its contents . . . , and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby."). But the agreement at issue is not an ordinary contract, and typical arm's-length principles that are completely appropriate in ordinary transactions may be less

so in dealings between attorney and client.[1] While attorney and client have substantial latitude in defining their relationship, *see Citizens Bank v. C & H Constr. & Paving Co.*, 1979-NMCA-106, ¶ 30, 93 N.M. 422, 600 P.2d 1212, there are necessary limits to the terms that they can agree upon—even at the outset of representation.

{17} "The relation of attorney and client is one of the highest trust and confidence, requiring the attorney to observe the utmost good faith towards his client, and not to allow his private interests to conflict with those of his client." *Guest v. Allstate Ins. Co.*, 2010-NMSC-047, ¶ 47, 149 N.M. 74, 244 P.3d 342 (alteration, internal quotation marks, and citation omitted). Thus, some courts "give particular scrutiny to fee arrangements . . . casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by their clients." *Wong v. Michael Kennedy, P.C.*, 853 F. Supp. 73, 80 (E.D.N.Y. 1994) (omission in original) (internal quotation marks and citations omitted). In New Mexico, while a contingency fee agreement will usually be enforced as written, our courts still follow the rule that the agreement must be reasonable and that it must have "been fairly and freely made, with full knowledge by the client of its effect and of all the material circumstances relating to the reasonableness of the fee." *Citizens Bank*, 1979-NMCA-106, ¶¶ 40-43 (internal quotation marks and

---

[1] On appeal, there is no apparent dispute that the parties were in an attorney-client relationship when the fee agreement was signed.

10

citation omitted). And when an attorney engages in a business transaction with an existing client, our courts "closely scrutinize[]" the agreement and require "a showing that the attorney made a full and frank disclosure of all relevant information that he had and that the client had independent advice before completing the transaction." *Van Orman v. Nelson*, 1967-NMSC-069, ¶¶ 55-58, 78 N.M. 11, 427 P.2d 896. This level of judicial scrutiny—foreign to ordinary transactions—is only justified because the relationship between attorney and client "has always been considered and treated as one of trust and confidence." *Id.* ¶ 57.

{18}     Whether the special nature of the attorney-client relationship in any way limits an attorney's ability to include a provision in a fee agreement requiring a client to arbitrate any future malpractice claim is an issue of first impression in New Mexico. The question has been carefully examined by the American Bar Association (ABA) and by state bar ethics committees, with the majority concluding that such a clause is at least ethically permitted, provided certain requirements typically involving the client's informed consent, are met. ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 02-425, at 7 (2002) (requiring the client's informed consent after full disclosure of advantages and disadvantages of agreeing to arbitrate); Ariz. Ethics Op. 94-05, at 5 (Mar. 1, 1994) (same); Tex. Ethics Op. 586, 72 Tex. B.J. 128, 129 ( Prof'l Ethics Comm. 2009) (same); Va. Legal Ethics Op. 1707, at 3 (Jan. 12, 1998) (same);

11

Cal. Ethics Op. 1989-116 (St. Bar. Comm. on Prof'l Responsibility & Conduct 1989), 1989 WL 253264, at *5 (same, but distinguishing between existing and prospective clients); Conn. Ethics Op. 99-20 (Bar Ass'n Comm. on Prof'l Ethics Jun. 22, 1999), 1999 WL 958027, at *2 ("With respect to arbitration clauses[,] a lawyer will satisfy his ethical duty to [a] client by using plain and intelligible wording in the clause, by directing the client's attention to the clause, and by fairly answering any questions the client asks concerning the clause."); NYCLA Ethics Op. 723 (Cty. Lawyers' Ass'n Comm. Prof'l Ethics July 17, 1997), 1997 WL 419331, at *4 (stating that the attorney must "fully disclose[] the consequences" of the provision, and allow the client an opportunity to seek independent counsel); Okla. Adv. Op. 312 (Bar Ass'n Legal Ethics Comm. Aug. 18, 2000), 2000 WL 33389634, at *6 (same); Vt. Adv. Ethics Op. 2003-7, at 1 (Comm. Prof'l Responsibility 2003) (same). At least one committee has determined (over dissent) that such agreements are permitted only if the client is actually represented by independent counsel. D.C. Ethics Op. 211 (May 15, 1990), *available at* https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion211.cfm. Only two committees have taken categorical approaches to the issue: the clauses are permitted in Maine and strictly prohibited in Ohio until an actual dispute arises. *See* Me. Ethics Op. 170 (Prof'l Ethics Comm'n Dec. 23, 1999), *available at*

http://mebaroverseers.org/attorney_services/opinion.html?id=89504; Ohio Adv. Op. 96-9 (Bd. Of Commr's on Grievances & Discipline Dec. 6, 1996), 1996 WL 734408, at *5.

{19} In 2002 the ABA's Standing Committee on Ethics and Professional Responsibility addressed the issue in detail. ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 02-425. The ABA persuasively concluded that a mandatory predispute arbitration clause is not a prospective limitation on malpractice liability in violation of the Model Rules of Professional Conduct "unless the retainer agreement insulates the lawyer from liability or limits the liability to which she otherwise would be exposed under common or statutory law." *Id.* at 3-4. However, an attorney's duties under the Rules to explain matters to a client and to avoid conflicts of interest are implicated when a retainer agreement includes a provision requiring arbitration of malpractice claims. *Id.* at 4-7. Since arbitration typically results in a client's waiver of significant rights, including the right to a jury trial, the right to broad discovery, and the right to an appeal on the merits, the ABA decided that an attorney should fairly explain those consequences, as well as the benefits of agreeing to arbitrate in order to comply with the Model Rules. *Id.* at 4-5 (citing Model Rules of Professional Conduct r 1.4(b) (Am. Bar Ass'n 2014), which requires an

13

attorney to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation").

{20} Based in part on the ethical concerns expressed in the ABA and state bar opinions, some courts have held that predispute attorney-client arbitration clauses are unenforceable as a matter of substantive law, unless the meaning and scope of the clauses were sufficiently disclosed to the client. *See, e.g.*, *Lawrence v. Walzer & Gabrielson*, 256 Cal. Rptr. 6, 10 (Ct. App. 1989); *Haynes v. Kuder*, 591 A.2d 1286, 1291-92 (D.C. 1991) (but concluding that the text of the clause itself, which referred to "the unavailability of court action" sufficiently conveyed all the information necessary); *Hodges v. Reasonover*, 103 So. 3d 1069, 1077-78 (La. 2012); *see also Kamaratos v. Palias*, 821 A.2d 531, 538-39 (N.J. Super. Ct. App. Div. 2003) (discussing consultation with an independent attorney as applied to fee disputes); *Thornton v. Haggins*, 2003 WL 23010100, at ¶ 10 (Ohio Ct. App. 2003) (mem.) (requiring consultation with an independent attorney as a prerequisite to enforcement), *but see Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 504-05 (Tex. 2015) ("[P]rospective clients who sign attorney-client employment contracts containing arbitration provisions are deemed to know and understand the contracts' content and are bound by their terms on the same basis as

are other contracting parties."); *Watts v. Polaczyk*, 619 N.W.2d 714, 718-19 (Mich. Ct. App. 2000) (same).

{21} We find the Louisiana Supreme Court's opinion in *Hodges* particularly instructive. Louisiana shares with New Mexico both a strong public policy favoring arbitration, *compare McMillan v. Allstate Indemnity Co.*, 2004-NMSC-002, ¶ 9, 135 N.M. 17, 84 P.3d 65, *with Hodges*, 103 So. 3d at 1072, and a general understanding that an attorney, consistent with the oath of his profession, owes a higher degree of fidelity to and communication with his client than transacting parties ordinarily owe one another, *see Hodges*, 103 So. 3d at 1073, 1077. In light of the attorney's fiduciary duties of "candor and loyalty in all dealings with a client[,]" and because arbitration clauses in fee agreements affect a client's material rights to a jury trial and appeal, the Court, citing ABA Formal Opinion 02-425, ultimately concluded that arbitration clauses in attorney-client agreements are only enforceable if the attorney makes a "full and complete disclosure of the potential effects of [the] arbitration clause, including the waiver of a jury trial, the waiver of the right to appeal, the waiver of broad discovery rights, and the possible high upfront costs of arbitration." *Hodges*, 103 So. 3d at 1078.

{22} The Louisiana approach is consistent with the policies expressed in our own Rules of Professional Conduct. For instance, Rule 16-104(B) NMRA, which is

identical to Model Rule 1.4(b)—relied upon by the ABA in Formal Opinion 02-425—requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 16-104(B). Rule 16-107(B) NMRA governs conflict of interest situations. The commentary to the Rule states: "[I]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." *Id.* cmt. 10. As the ABA noted, "claims against lawyers for malpractice obviously implicate such concerns." ABA Formal Op. 02-425, at 7. Both of these general considerations are specifically evident in our rule addressing prospective limitations on malpractice liability: The Rules do not "prohibit a lawyer from entering into an agreement with the client to arbitrate legal malpractice claims, provided such agreements are enforceable *and the client is fully informed of the scope and effect of the agreement.*" Rule 16-108(H) comm. cmt. 14 NMRA (emphasis added).

{23}     We recognize that the Rules of Professional Conduct do not have the force of substantive law. *See generally Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 1988-NMSC-014, ¶¶ 18-21, 106 N.M. 757, 750 P.2d 118 (holding that a violation of the Rules does not, by itself, give rise to a private cause of action). However, the Rules in this instance are also an expression of an attorney's fiduciary obligations of

candor and loyalty to his client—an expression of public policy that can preclude enforcement of other transactions between attorney and client when those duties are violated. *C.f. Van Orman*, 1967-NMSC-069, ¶¶ 55-58. We conclude that if an attorney is going to require his client, within the context of their relationship of trust, to waive the right to a jury trial for a future malpractice dispute, such a waiver should be made knowingly with the client's informed consent. "[F]or the purpose of obtaining informed consent, adequate communication will ordinarily include disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives." *Spencer v. Barber*, 2013-NMSC-010, ¶ 34, 299 P.3d 388 (internal quotation marks and citation omitted). At a minimum, the attorney should inform his client that arbitration will constitute a waiver of important rights, including, the right to a jury trial, potentially the right to broad discovery, and the right to an appeal on the merits.

{24}     Here, the text of the clause itself is no help. It declares in a single sentence only that client and attorney agree to submit "any dispute" to arbitration. We have already held that this is technically sufficient to apply to malpractice claims. However, it is not sufficient to inform the client "of the material advantages and disadvantages of

17

the proposed course of conduct." *See id.* If Plaintiff truly was never warned that he "was waiving [his] right to a trial by jury" if he sued his attorneys for malpractice, as he stated in his affidavit, then inclusion of such a broadly worded and unexplained material term was an overreach by his attorneys that will not be enforced in this Court.

{25} Despite Plaintiff's affidavit claiming otherwise, the district court found that "factual circumstances surrounding the formation of the [fee agreement] indicate that . . . Plaintiff was free to accept or decline the terms" and "Plaintiff knowingly accepted the terms." The only apparent source of this latter conclusion is the court's finding that Plaintiff "continued with the representation" after signing the fee agreement and, prior to this malpractice dispute, "elected to proceed with further and subsequent representation with [Defendants] and other attorneys using the same or similar arbitration provisions[.]" In that vein, Defendants argue at length that Plaintiff never disputed that he later signed four similarly worded agreements and that Plaintiff was always given an opportunity to ask questions and given a copy of the agreement for his files.

{26} That Plaintiff continued with the representation proves nothing. That he later signed similar agreements under similar circumstances demonstrates only that Defendants routinely included the same clause in their agreements with Plaintiff,

18

potentially without ever explaining the meaning and scope of that clause. There are competing affidavits from the parties. One says that Defendants explained each provision of the fee agreement, and that Plaintiff indicated he understood the meaning of the arbitration clause. The other says that Defendants never "discuss[ed] with [Plaintiff] anything about arbitration[.]" With contradictory affidavits and without any evidentiary hearing, the district court could not have resolved the only relevant factual dispute: Before seeking Plaintiff's signature on this agreement, did Defendants, consistent with their fiduciary obligations, sufficiently disclose the meaning and scope of the arbitration provision? When Plaintiff sought to conduct depositions to test the affidavits, his request for discovery was denied.

{27} On this record we cannot determine whether the motion to compel arbitration was properly granted. We will treat the issue as analogous to the grant of a summary judgment motion. *DeArmond*, 2003-NMCA-148, ¶ 4. Since disputed factual circumstances surrounding the adequacy of the disclosures made to Plaintiff are at the "heart of this case," we conclude that remand is appropriate. *See Spencer*, 2013-NMSC-010, ¶ 39.

**C.   Defendants' Arguments**

{28} We briefly address Defendants' two remaining arguments. First, Defendants argue that Plaintiff "is not free to pick and choose which portions of the contract he

wishes to enforce, and absent any applicable affirmative defense, remains bound by the contract as a whole." Second, Defendants argue that Plaintiff's claim of a breach of fiduciary duty is an effort to place the merits of the case before the appellate courts.

{29}    The first argument is not persuasive. Plaintiff is challenging the arbitration clause as an unexplained and unenforceable material term within an otherwise enforceable contract. He is doing so while simultaneously alleging, in part, that Defendants breached that contract. This is no different than the challenges to arbitration asserted in many of our leading cases. *See, e.g.*, *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶¶ 7-8, 150 N.M. 398, 259 P.3d 803 (alleging breach of contract while disputing the enforceability of the arbitration clause in that contract). In the only authority cited by Defendants, we applied the rule that a nonsignatory "is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing" the clause. *Damon v. StrucSure Home Warranty, LLC*, 2014-NMCA-116, ¶¶ 11, 14, 338 P.3d 123 (internal quotation marks and citation omitted). "In the arbitration context, [this] doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the . . . clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th

Cir. 2000). Of course, Plaintiff makes no allegation that the clause should not be enforced against him on the ground that he is a non-signatory to the fee agreement, making the equitable principle applied in *Damon* wholly inapposite.

{30} With respect Defendants' second argument, we clarify that we are not deciding any aspect of Plaintiff's substantive malpractice claim. We are only defining the parameters by which a claim of malpractice in the attorney-client relationship is arbitrable. The underlying malpractice claim is to be resolved in arbitration or in the district court, depending on the district court's resolution of the relevant factual dispute. *See Felts v. CLK Mgmt., Inc.*, 2011-NMCA-062, ¶ 17, 149 N.M. 681, 254 P.3d 124 ("The general rule is that the arbitrability of a particular dispute is a threshold issue to be decided by the district court unless there is clear and unmistakable evidence that the parties decided otherwise under the terms of their arbitration agreement.").

## III.   CONCLUSION

{31} We remand for the district court to determine whether Defendants sufficiently disclosed the meaning and scope of the arbitration agreement to Plaintiff. On remand, the court should hold an evidentiary hearing on the issue. If Defendants did not inform Plaintiff that the agreement constituted a waiver of important rights, including

the right to a jury trial, potentially the right to broad discovery, and the right to an appeal on the merits, then Defendants' motion to compel arbitration should be denied.

**{32}** **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**J. MILES HANISEE, Judge**