MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2017 ME 239
Docket:       Cum-17-54
Argued:       October 25, 2017
Decided:      December 21, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

SUSAN R. SNOW

v.

BERNSTEIN, SHUR, SAWYER & NELSON, P.A., et al.

JABAR, J.

[¶1]   Bernstein, Shur, Sawyer & Nelson, P.A., and J. Colby Wallace (collectively, Bernstein) appeal from a Superior Court (Cumberland County, *Warren, J.*) order denying its motion to compel arbitration in a legal malpractice claim filed against it.  Bernstein contends that the court erred when it concluded that Bernstein failed to obtain informed consent from its client, Susan Snow, to submit malpractice claims to arbitration, and that federal law does not preempt a rule requiring attorneys to obtain such informed consent from their clients.  We agree with the Superior Court and affirm the judgment.

## I. BACKGROUND

[¶2]   The following undisputed facts are set forth in Snow and Bernstein's opposing affidavits filed in conjunction with Bernstein's motion to compel arbitration and Snow's motion to stay arbitration.

[¶3]  In May 2012, Susan Snow retained Bernstein to represent her in a civil action.  The firm presented for Snow's signature an engagement letter that, inter alia, set forth the scope of its representation.  Located on the last page of that letter was a signature line, above which a bold-faced sentence provided: "I agree to the terms of this letter including the attached standard terms of engagement."  Bernstein attached a document to the engagement letter titled "Standard Terms of Engagement for Legal Services."   The provision at the heart of this dispute is found on the last page of that document and is titled "Arbitration."   That provision provides, in pertinent part:

> If you disagree with the amount of our fee, please take up the question with your principal attorney contact or with the firm's managing partner.  Typically, such disagreements are resolved to the satisfaction of both sides with little inconvenience or formality.  In the event of a fee dispute that is not readily resolved, you shall have the right to submit the fee dispute to arbitration under the Maine Code of Professional Responsibility.  *Any fee dispute that you do not submit to arbitration under the Maine Code of Professional Responsibility, and any other dispute that arises out of or relates to this agreement or the services provided by the law*

> *firm shall also, at the election of either party, be subject to binding arbitration.* Either party may request such arbitration by sending a written demand for arbitration to the other. If a demand for arbitration is made, you and the firm shall attempt to agree on a single arbitrator. If no agreement can be reached within 30 days of the receipt of the demand, the party demanding arbitration may designate an arbitrator by sending a written notice to the other party. Within two weeks of that initial designation, the other party shall designate an arbitrator in writing. Thereafter, those two designated arbitrators shall meet promptly to select a third arbitrator. The arbitrators shall conduct the arbitration proceedings according to the procedures under the commercial arbitration rules of the American Arbitration Association and shall hold the arbitration hearing in Maine. . . . Either party shall have the right to appeal a decision of the arbitrators on the grounds that the arbitrators failed to properly apply the law.

(Emphasis added.)

[¶4] Snow subsequently signed the last page of the engagement letter.[1] At no time—before or after signing the letter—did Bernstein explain to her that, by providing her signature, she was agreeing to submit any future malpractice claims against the firm to binding arbitration.

[¶5] In August 2016, Snow filed a complaint and jury demand against Bernstein alleging that the firm committed legal malpractice in connection with its handling of her case. Shortly after, Snow filed a motion to stay threatened arbitration pursuant to 14 M.R.S. § 5928(2) (2016). In response,

---

[1] The scope of the agreement was later amended, but the arbitration provision was left unchanged.

4

relying on the arbitration provision in the engagement letter, Bernstein filed a motion to compel arbitration.

[¶6] The court denied Bernstein's motion and granted Snow's. Relying on the Maine Rules of Professional Conduct, comments to those Rules, and opinions of the Maine Professional Ethics Commission that interpreted the Rules, the court concluded that, to include an agreement to arbitrate future malpractice claims against the firm in an engagement letter, Bernstein was obligated to fully inform Snow of the scope and effect of that agreement. Because Bernstein had failed to obtain informed consent, the court concluded that the arbitration provision violated public policy and was therefore unenforceable. The court further concluded that, because an attorney's obligation to obtain the informed consent of his clients does not apply solely to arbitration agreements, requiring informed consent in this context was not preempted by the Federal Arbitration Act (FAA), 9 U.S.C.S. §§ 1-307 (LEXIS through Pub. L. No. 115-90). Neither party moved for additional findings of fact pursuant to M.R. Civ. P. 52(b). Bernstein's timely appeal followed. *See* 14 M.R.S. § 5945(1)(A) (2016), (B); M.R. App. P. 2(b)(3) (Tower 2016).[2]

---

[2] The restyled Maine Rules of Appellate Procedure do not apply because this appeal was filed prior to September 1, 2017. *See* M.R. App. P. 1 (restyled Rules).

## II.  DISCUSSION

### A.    Standard of Review

[¶7]  "We review the denial of a motion to compel arbitration for errors of law and for facts not supported by substantial evidence in the record." *Saga Commc'ns of New England, Inc. v. Voornas*, 2000 ME 156, ¶ 7, 756 A.2d 954. Here, the facts before the Superior Court were set out in affidavits executed by Snow and Bernstein.  Because those affidavits did not contain any disputed facts, we determine de novo whether the court made any errors of law and whether the court's conclusion is supported by the facts.  *See id.*

[¶8]  This appeal requires us to determine whether the court erred when it concluded that (1) Bernstein's failure to obtain informed consent from Snow regarding an arbitration provision rendered that provision unenforceable as contrary to public policy, and (2) the Federal Arbitration Act does not preempt a requirement that attorneys obtain informed consent from their clients before contracting to submit disputes to arbitration.[3]

---

[3]  Bernstein also argues that the court misapplied the burden of proof by requiring it to prove that the arbitration provision was enforceable.  However, Bernstein has only raised that issue for the first time on appeal.  Thus, the issue is not properly preserved and is deemed waived.  *See Cyr v. Cyr*, 432 A.2d 793, 797 (Me. 1981).

6

B.    Enforceability of Agreement to Arbitrate

[¶9]   Bernstein argues that the court erred in concluding that the arbitration provision concerning malpractice claims against the firm, contained in the engagement letter that Snow signed, is contrary to public policy and therefore unenforceable.  Snow counters that the court correctly determined that public policy—as set forth in Maine's Rules of Professional Conduct—required Bernstein to "communicate adequate information and explanation to obtain [Snow's] informed consent to an arbitration."  According to Snow, Bernstein's failure to obtain her informed consent rendered the arbitration agreement unenforceable.   The parties' arguments before us center on two competing interests: the enforcement of arbitration contracts and the professional standards set forth in the Maine Rules of Professional Conduct.

1.    Maine's Uniform Arbitration Act

[¶10]  Maine's Uniform Arbitration Act (MUAA), 14 M.R.S. §§ 5927-5949 (2016), provides that "[a] written agreement . . . or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable."  14 M.R.S. § 5927.  Given the "Maine legislature's strong policy favoring arbitration," courts will ordinarily

enforce arbitration agreements "if the parties have generally agreed to arbitrate disputes and if the party seeking arbitration is making a claim which, *on its face,* is governed [by the contract]." *Westbrook Sch. Comm. v. Westbrook Teachers Ass'n*, 404 A.2d 204, 207-08 (Me. 1979) (quotation marks omitted). Despite this strong presumption in favor of substantive arbitrability, *see V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 2001 ME 73, ¶ 4, 770 A.2d 95, the MUAA provides that agreements to arbitrate may be nullified "upon such grounds as exist at law or in equity for the revocation of any contract," 14 M.R.S. § 5927.

[¶11]   One "such ground[]" upon which a court may invalidate an arbitration provision is where the agreement contravenes public policy.  *Id.*; *see Allstate Ins. Co. v. Elwell*, 513 A.2d 269, 272 (Me. 1986) ("A contract that contravenes public policy will not be enforced by our courts."); *Corbin v. Houlehan*, 100 Me. 246, 251, 61 A. 131 (1905) ("It is a fundamental and elementary rule of the common law that courts will not enforce . . . contracts which are contrary to public policy . . . .").  "A contract is against public policy if it clearly appears to be in violation of some well established rule of law, or that its tendency will be harmful to the interests of society." *Elwell*, 513 A.2d at 272 (quotation marks omitted); *see also State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶¶ 42-44, 995 A.2d 651.   The question before us,

8

therefore, is whether an attorney's failure to obtain informed consent from a client regarding an arbitration clause for any legal malpractice claim against that attorney is contrary to public policy.

2. Public Policy as Expressed in the Rules of Professional Conduct

[¶12]  Because nullifying a private, written contract provision should not be undertaken lightly, we look carefully at the argument that a provision contravenes an important public policy.  The policy at issue here concerns the profession of law, which is uniquely within the purview of the courts.

[¶13]  Effective August 1, 2009, we adopted the Maine Rules of Professional Conduct, which are styled after the American Bar Association's (ABA) Model Rules.  *See* M.R. Prof. Conduct preamble (1).  Our "acceptance of these rules maximizes conformity with those states embracing the ABA Model Rules and also preserves the integrity of the manner in which Maine lawyers practice law."  *Id.*  Maine Bar Rule 8 establishes the Maine Professional Ethics Commission, a body tasked with rendering "advisory opinions to [this] Court, the Board, Bar Counsel, and the Grievance Commission on matters involving the interpretation and application of the Maine Rules of Professional Conduct."  M. Bar. R. 8(d)(1).

[¶14]   The Maine Rules of Professional Conduct do not explicitly address the issue presented by this appeal: if, and to what extent, an attorney or law firm must inform a prospective client about the effect of a provision that prospectively requires the client to submit malpractice claims against that attorney or firm to arbitration.  However, interpretations of the Rules by both the Maine Professional Ethics Commission and the ABA, expressed in advisory opinions, indicate that for such a provision to comply with the Rules, the client must be fully informed of its scope and effect.

[¶15]  In 1999, the Maine Professional Ethics Commission concluded in an Opinion that attorneys may enter into agreements to arbitrate malpractice claims arising out of the attorney-client relationship and that, for such an agreement to be enforceable, an attorney need not advise the client to seek independent counsel to discuss the desirability of entering into such an agreement. Me. Prof. Ethics Comm'n, Op. No. 170 (Dec. 23, 1999).  However, the opinion did not address whether, and to what extent, the attorney must inform the client of the scope and effect of those agreements.  *See id.*

[¶16]  More than two years later, the ABA Standing Committee on Ethics and Professional Responsibility issued a formal opinion in which it addressed whether, under the Model Rules of Professional Conduct, an attorney has a

duty to inform a client of the existence and effect of a provision contained in a retainer agreement that requires the client to submit any malpractice claims against the firm to binding arbitration. ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 02-425 (2002). The Standing Committee answered that question in the affirmative, concluding that because attorneys serve as fiduciaries to their clients, and because agreeing to arbitration often results in a client waiving significant rights, an attorney must "explain the implications of the proposed binding arbitration provision to the extent reasonably necessary to permit the client to make an informed decision about whether to agree to the inclusion of the binding arbitration provision in the agreement." *Id.* (alteration omitted) (quotation marks omitted). To fulfill this duty, the Committee announced, a lawyer should

> explain the possible adverse consequences as well as the benefits arising from execution of the agreement. For example, the lawyer should make clear that arbitration typically results in the client's waiver of significant rights, such as the waiver of right to a jury trial, the possible waiver of broad discovery, and the loss of the right to appeal.

*Id.*

[¶17] In 2011, Maine's Professional Ethics Commission issued an Opinion that addressed a similar issue. *See* Me. Prof. Ethics Comm'n, Op. No. 202 (Jan. 9, 2011). The Commission determined that, when an attorney seeks

to include in an engagement letter a provision waiving the client's right to a jury trial for claims arising out of the attorney's representation, that attorney must obtain the client's informed consent in order to comply with the Rules of Professional Conduct. *Id.* The Commission reasoned that "[l]anguage in an engagement agreement waiving the right to a jury trial, like a limitation on venue or a requirement to arbitrate disputes between lawyer and client, involves the means of resolving disputes." *Id.* Noting these similarities, the Commission relied on comment 14 to Maine Rule of Professional Conduct 1.8, which provides that an attorney may permissibly enter into an agreement to prospectively submit malpractice claims to arbitration if "the client is fully informed of the scope and effect of the agreement." *Id.* (citing M.R. Prof. Conduct 1.8 cmt. (14)). For that reason, the Commission concluded that an attorney must obtain "informed consent as to the scope and effect of an arbitration requirement or a jury waiver clause." *Id.* According to the Commission, this result was warranted in light of an attorney's obligation to render candid advice and inform the client on matters "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *Id.* (citing M.R. Prof. Conduct 1.4(b)); *see* M.R. Prof. Conduct 2.1; see *also Sargent v. Buckley*, 1997 ME 159, ¶ 9, 697 A.2d

12

1272 ("[A]n attorney and client necessarily share a fiduciary relationship of the highest confidence." (quotation marks omitted)).

[¶18] The above-cited rules, together with the guidance provided by Maine's Professional Ethics Commission and by the ABA's Standing Committee on Ethics,[4] reflect the following policy: to enforce a contractual provision that prospectively requires a client to submit malpractice claims against the law firm to arbitration, an attorney must have first obtained the client's informed consent as to the scope and effect of that provision. This policy is based on the long-standing principle that attorneys owe a fiduciary duty of "undivided loyalty" to their clients, a duty that is derived from the common law and that "predate[s] and exist[s] despite independent, codified ethical standards." *Sargent*, 1997 ME 159, ¶ 9, 697 A.2d 1272 (quotation marks omitted). This policy is also rooted in Maine's "broad constitutional guarantee of a right to a jury" trial in civil matters. *DiCentes v. Michaud*, 1998 ME 227, ¶ 7, 719 A.2d

---

[4] Bernstein argues that neither the comments to the Rules of Professional Conduct nor the Commission's interpretation of the Rules can constitute public policy because—unlike the Rules themselves—we have not explicitly adopted them. However, this argument ignores the fact that the Maine Rules are modeled after the ABA Model Rules and that, on several occasions, we have utilized these authorities to interpret the Rules. *See, e.g.*, *Bd. of Overseers of the Bar v. Warren*, 2011 ME 124, ¶ 26, 34 A.3d 1103*; Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 20, 742 A.2d 933 (adopting a rule that "is consistent with the rule adopted by the [ABA's] committee on Ethics and Professional Responsibility"); *see also* M.R. Prof. Conduct preamble (1). Moreover, although Maine Professional Ethics Commission opinions are not binding, they are promulgated by a body created for the purpose of rendering opinions that interpret the Rules of Professional Conduct. *See* M. Bar R. 8(d)(1).

509 (quotation marks omitted); *see* Me. Const. art. I, § 20.  Therefore, given these considerations, it follows that a heightened standard is required when an attorney—with whom a client has a fiduciary relationship—seeks to have that client waive a fundamental right through a provision in an engagement letter.  *See Castillo v. Arrieta*, 368 P.3d 1249, 1257 (N.M. Ct. App. 2016) ("We conclude that if an attorney is going to require his client, within the context of their relationship of trust, to waive the right to a jury trial for a future malpractice dispute, such a waiver should be made knowingly with the client's informed consent.").

[¶19]  Accordingly, we now implement the public policy reflected by Maine Rule of Professional Conduct 1.8 cmt. (14) and the opinions of the Maine and ABA Ethics Commissions.  Maine attorneys must obtain a client's informed consent regarding the scope and effect of any contractual provision that prospectively requires the client to submit malpractice claims against those attorneys to arbitration.  *See* M.R. Prof. Conduct 1.8 cmt. (14).  To obtain the client's informed consent, the attorney must effectively communicate to the client that malpractice claims are covered under the agreement to arbitrate.  The attorney must also explain, or ensure that the client understands, the differences between the arbitral forum and the judicial

forum, including the absence of a jury and such "procedural aspects of forum choice such as timing, costs, appealability, and the evaluation of evidence and credibility." Me. Prof. Ethics Comm'n, Op. No. 202. Furthermore, to ensure the client is informed "to the extent reasonably necessary to permit the client to make [an] informed decision[]," the attorney should take into account the particular client's capacity to understand that information and experience with the arbitration process, as these factors may affect both the breadth of information and the amount of detail the attorney is obligated to provide. *See* M.R. Prof. Conduct 1.4(b); *Bezio v. Draeger*, 737 F.3d 819, 823, 825 (1st Cir. 2013) (noting that, although the degree to which an attorney must explain a matter "will vary by client," the appellant seeking to invalidate an arbitration clause in that case "knew very well from his past experience with . . . arbitrations what arbitration was and the consequences of signing such a clause").

3.  Agreement to Arbitrate

[¶20]  Reviewing the undisputed facts before us, we conclude that Bernstein did not fully inform Snow of the scope and effect of the agreement to arbitrate. In her affidavit to the Superior Court, Snow stated that Bernstein did not (1) inform her that the engagement letter contained an arbitration

provision, (2) explain to her the scope of that arbitration provision, or (3) explain to her the differences between the arbitral forum and the judicial forum. Bernstein did not dispute these assertions in its own affidavit. Snow also averred that Bernstein failed to inform her that, by signing the engagement letter, she was waiving her right to resolve disputes against Bernstein through the court system, including the right to trial by jury. This assertion is also undisputed.

[¶21] Instead, Bernstein argues that the language of the arbitration provision—providing, in part, that "any other dispute that arises out of or relates to this agreement or the services provided by the law firm shall also, at the election of either party, be subject to binding arbitration"— unambiguously informed Snow of the scope and effect of the agreement to arbitrate. Read in context, however, the arbitration provision was not sufficiently clear to inform her that she was agreeing to submit malpractice claims against her attorney to arbitration, let alone to inform her of the scope and effect of any such agreement. The first three sentences of the arbitration provision directly pertained to fee disputes. Aside from fee disputes, no other form of proceeding or conflict is mentioned with any specificity in the arbitration provision.

[¶22] Rather, the text purporting to require parties to submit "any other dispute" to binding arbitration is preceded by a more specific directive: "Any fee dispute that you do not submit to arbitration under the Code of Professional Responsibility, and any other dispute that arises . . . shall . . . be subject to binding arbitration."  Pursuant to the interpretive principle of *ejusdem generis*, "the meaning of a general term in a contract is limited by accompanying specific illustrations.  Thus, any meaning given to the general term must have a reasonable degree of similarity" to the more specific term. 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.28 at 309 (rev. ed. 1998); *see New Orleans Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 7, 728 A.2d 673. As such, the meaning of the term "any other dispute" may be reasonably interpreted as limited by the provision's reference to "fee dispute."  Moreover, although the engagement letter specified such aspects of the parties' relationship as scope of representation, fees and expenses, and termination of the attorney-client relationship, the letter itself failed to specifically emphasize that disputes against Bernstein regarding its legal services would be subject to arbitration.  To the contrary, the arbitration provision was only incorporated by way of the engagement letter's reference to "Standard Terms

of Engagement," and even then, it was buried on the last page of that document.

[¶23] For these reasons, the undisputed evidence supports the conclusion that Bernstein did not fully inform Snow as to the scope and effect of the agreement to arbitrate, as is required by the Maine Rules of Professional Conduct and the Maine Professional Ethics Commission opinions interpreting those Rules. Therefore, the Superior Court did not err in concluding that the arbitration provision was unenforceable for violating public policy. *Cf. Peaslee v. Pedco, Inc.*, 388 A.2d 103, 107 (Me. 1978) (affirming the rescission of a contract where an attorney breached his duty of loyalty by failing to disclose his personal interest in a transaction involving clients); *see Castillo*, 368 P.3d at 1256-58 (refusing to enforce an agreement to arbitrate malpractice claims, despite the state's "strong public policy favoring arbitration," where the record was unclear as to whether the attorney obtained informed consent).

C.   Federal Arbitration Act Preemption

[¶24] Bernstein also argues that, even assuming Maine attorneys are obligated to obtain informed consent from their clients regarding arbitration

provisions, such an obligation "singles out" arbitration agreements and is thus preempted by the Federal Arbitration Act (FAA).

[¶25]   The FAA, like the MUAA, provides that written arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C.S. § 2 (LEXIS through Pub. L. No. 115-90).  Although "the FAA contains no express preemptive provision and does not reflect a congressional intent to occupy the entire field of arbitration, it preempts state law to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 431-32 (9th Cir. 2015) (alteration omitted) (citation omitted) (quotation marks omitted).  To that end, a contract defense available to a party seeking to invalidate an agreement to arbitrate cannot "apply only to arbitration or . . . derive [its] meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 432 (quotation marks omitted).  By enacting the FAA, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (quotation marks omitted).  Therefore, in instances where a state law

"singl[es] out" arbitration contracts specifically, the FAA will preempt that state law. *See id.*

[¶26] Here, the requirement in question—that attorneys fully inform a client of the scope and effect of a contractual provision requiring the client to submit any malpractice claims against the firm to arbitration—does not "singl[e] out" arbitration agreements, and is therefore not preempted by the FAA. This requirement neither "derives [its] meaning from the fact that an agreement to arbitrate is at issue," nor applies strictly to arbitration agreements. *Sakkab*, 803 F.3d at 432 (quotation marks omitted). As explained above, this obligation is rooted in principles unrelated to arbitration in particular and applies to situations that go beyond arbitration: namely, that as a general matter, an attorney—who stands as a fiduciary to his client— should fully inform that client as to the scope and effect of her decision to waive significant rights. *Cf. Casarotto*, 517 U.S. at 683 (concluding that a state law governing not *any contract*, but specifically and solely contracts *subject to arbitration*, conflicted with the FAA and was therefore preempted). Accordingly, the court did not err in concluding that the rule requiring Bernstein to fully inform Snow of the scope and effect of the agreement to arbitrate was not preempted by the FAA.

The entry is:

Judgment affirmed.

---

Melissa A. Hewey, Esq. (orally), and Timothy E. Steigelman, Esq., Drummond Woodsum, Portland, for appellants Bernstein, Shur, Sawyer & Nelson, P.A., and J. Colby Wallace

Thomas F. Hallett, Esq., and Benjamin N. Donahue, Esq. (orally), Portland, for appellee Susan R. Snow