# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 55

APRIL TERM, A.D. 2021

April 23, 2021

GEORGIA NOEL INMAN,

Appellant
(Plaintiff),

v.

MATTHEW G. GRIMMER, individually;
JACOB R. DAVIS, individually; GRIMMER
& ASSOCIATES, P.C., a Utah professional
corporation; and GRIMMER, DAVIS,
REVELLI & BALLIF, a Utah professional
corporation,

Appellees
(Defendants).

S-20-0178

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
   John H. Robinson and Lauretta Y. Welch of Robinson Stelting Welch Bramlet LLC,
   Jackson, Wyoming.  Argument by Mr. Robinson and Ms. Welch.

*Representing Appellees Matthew G. Grimmer, Jacob R. Davis and Grimmer, Davis,*
*Revelli & Ballif, P.C.:*
   Daniel P. Murphy and Eric M. Lee of Murphy & Decker, P.C., Denver, Colorado.
   Argument by Mr. Murphy.

*Representing Appellees Grimmer & Associates, P.C.:*
   Jacob R. Davis of Grimmer Davis Revelli & Ballif, P.C., Lehi, Utah.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]   Georgia Noel Inman filed a legal malpractice complaint against Matthew G. Grimmer, Jacob R. Davis, Grimmer & Associates, P.C., and Grimmer, Davis, Revelli & Ballif, P.C.[1] (collectively Grimmer).  Grimmer filed a motion to dismiss and compel arbitration based on the arbitration provision in the parties' engagement agreement.  The court granted Grimmer's motion to compel arbitration and dismissed the complaint.  Ms. Inman appeals, arguing the district court erred when it granted the motion to compel arbitration because the arbitration provision and the engagement agreement are unenforceable, and when it dismissed her complaint without ruling on the enforceability of the engagement agreement.

[¶2]   We conclude the district court: erred when it failed to stay the malpractice action as required by the Wyoming and Utah Uniform Arbitration Acts; properly limited its review to whether the arbitration provision was enforceable; and correctly ruled on the enforceability of the arbitration provision.  We therefore affirm the district court's order compelling arbitration, but reverse its dismissal of the action and remand with instructions to stay the proceedings pending arbitration.

### ISSUES

[¶3]   We restate the issues as:

1. Did the district court err when it dismissed Ms. Inman's malpractice suit pending arbitration?

2. Did the district court err by limiting the scope of its arbitrability ruling to the enforceability of the arbitration provision?

3. Is the arbitration provision enforceable?

### FACTS

[¶4]   Ms. Inman's father, Walker P. Inman Jr., created the Walker P. Inman Jr. Revocable Trust (the WPI Trust) naming Ms. Inman, her twin brother Walker Patterson Inman (Patterson), and their stepmother, Daralee Inman, as beneficiaries.[2]  Walker died in February 2010 when Ms. Inman and Patterson were 12 years old.  After Walker's death, the children's biological mother, Daisha Williams, took custody of Ms. Inman and

---

[1] Grimmer, Davis, Revelli & Ballif, P.C., a Utah Professional Corporation, is the successor firm to Grimmer & Associates, P.C.

[2] The WPI Trust owned multi-million-dollar properties in Wyoming and South Carolina, and all of Walker's personal property, including "guns, artwork, jewelry, etc."

Patterson. Daisha and the children moved to Utah, where Daisha hired Grimmer to represent the three of them.

[¶5]    Grimmer represented Ms. Inman, Patterson, and Daisha over the next three years, including in a probate action and a civil action in Wyoming against Daralee, challenging her depletion of trust assets. Grimmer also grew involved in Ms. Inman's life, helping her find employment, arranging educational tutors, and assisting her with travel arrangements, health care, and buying a car. After she turned 18 in 2015, Ms. Inman signed a new engagement agreement at Grimmer's request. The new agreement contained an arbitration provision. Grimmer also continued to represent Patterson and Daisha.

[¶6]    Ms. Inman's and Patterson's interests soon diverged. By 2017, Ms. Inman wished to end the litigation against Daralee but Patterson did not. In 2016 and 2017, Grimmer helped Patterson attempt to buy real property from the WPI Trust. During this time, Grimmer also drew up and had Ms. Inman sign documents regarding the real property and the trust litigation that benefitted Patterson. Ms. Inman claims Grimmer told her these documents would help end the litigation against Daralee, and did not explain how they might adversely effect her interests. Ms. Inman fired Grimmer in September 2017. Grimmer continued to represent Patterson in matters involving Ms. Inman.

[¶7]    Ms. Inman filed her legal malpractice action in Wyoming in June 2019, alleging Grimmer violated the Wyoming Rules of Professional Conduct and breached its fiduciary duties in numerous ways. In response, Grimmer filed a motion to dismiss and compel arbitration, referring the district court to the following arbitration provision in their engagement agreement:

> Any dispute arising out of, in connection with, or in relation to the interpretation, performance or breach of this agreement— including any claim of legal malpractice (or similar claim) and any claim involving fees or expenses—shall be resolved by final and binding arbitration conducted in Utah County, Utah, administered by and in accordance with the Utah Uniform Arbitration Act, and any judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction to do so. Client further acknowledges that, by so agreeing, Client waives the right to a jury trial. Client also acknowledges that arbitration provides only limited discovery and that courts will enforce an award in arbitration without reviewing it for errors of fact or law.

Grimmer asserted Ms. Inman's claims fell within the scope of the provision, and therefore she should be required to submit them to arbitration in Utah.

2

[¶8]   Ms. Inman responded, arguing both the engagement agreement and arbitration provision were unenforceable as unconscionable and in violation of public policy. Because both parties submitted materials outside the pleadings, the court converted Grimmer's motion to dismiss to a summary judgment motion. The court awarded summary judgment to Grimmer. It held that the arbitration provision was enforceable and the engagement agreement was arbitrable. The court concluded the arbitrator must determine whether the engagement agreement was enforceable. The court then dismissed Ms. Inman's complaint and ordered the parties to arbitrate. Ms. Inman appealed.

## STANDARD OF REVIEW

[¶9]   We review the district court's ruling on Grimmer's motion to compel arbitration de novo. *See Miller v. Life Care Centers of America, Inc.*, 2020 WY 155, ¶ 13, 478 P.3d 164, 168 (Wyo. 2020) (citing *Hancock v. American Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012).

## DISCUSSION

[¶10]  Wyoming and Utah each have an interest in this matter—the engagement agreement and the arbitration provision provide that Utah law should govern, but Ms. Inman filed her malpractice suit in Wyoming.   Both states have adopted versions of the Uniform Arbitration Act, which: inform each state's case law on matters regarding appealability of arbitration rulings; prescribe the procedural posture for any underlying action when the court orders arbitration; and set forth the exclusive procedure and scope of action district courts must follow when a party seeks to compel arbitration. *See* Wyo. Stat. Ann. §§ 1-36-101 et seq. (LexisNexis 2019); Utah Code Ann. §§ 78B-11-101 et seq. The answer to the first two issues, though procedural and thus governed by Wyoming law, *Denbury Onshore, LLC v. APMTG Helium LLC*, 2020 WY 146, ¶ 24, 476 P.3d 1098, 1105 (Wyo. 2020), is the same under either state's laws. Because the third issue is substantive, we will honor the parties' choice of law and apply Utah law. *See id.*

### Appealability and Stay of the Underlying Action

[¶11]  We first consider our jurisdiction to review the district court's order compelling arbitration. *See McCallister v. State ex rel. Department of Workforce* Services, 2019 WY 47, ¶ 10, 440 P.3d 1078, 1081 (Wyo. 2019) (providing that a challenge to jurisdiction can be raised by the Court sua sponte at any time). The Wyoming and Utah Uniform Arbitration Acts similarly identify which arbitration rulings may be appealed, and an order compelling arbitration does not appear on either list. *See* Wyo. Stat. Ann. § 1-36-119(a); Utah Code Ann. § 78B-11-129(1). The Wyoming act states:

3

(a) An appeal may be taken from:

      (i) An order denying the application to compel arbitration;

      (ii) An order granting an application to stay arbitration;

      (iii) An order confirming or denying confirmation of an award;

      (iv) An order modifying or correcting an award;

      (v) An order vacating an award without directing a rehearing; or

      (vi) A final judgment or decree entered by the court.

We exercise appellate jurisdiction in this case because the district court's order dismissing Ms. Inman's complaint constitutes a final judgment. *Scherer v. Schuler Custom Homes Const.*, 2004 WY 109, ¶¶ 12–13, 98 P.3d 159, 162 (Wyo. 2004) (concluding that this Court had jurisdiction to review an order compelling arbitration where the district court dismissed the underlying action); *see also McGibbon v. Farmers Ins. Exchange*, 2015 UT 3, ¶¶ 9–10, 345 P.3d 550 (holding that an order compelling arbitration and dismissing the underlying action is a final, appealable order).

[¶12] In *Scherer*, a breach of contract case, the district court applied summary judgment review to Schuler's motion to dismiss and compel arbitration. *Scherer*, ¶¶ 1, 7–9, 98 P.3d at 160, 161. Upon granting the motion and ordering arbitration, the court dismissed the underlying action. *Id.* ¶ 12, 98 P.3d at 162. We determined on appeal that though the order "did not decide the parties' underlying dispute," "[t]he matter was not stayed" and "any future appeal from an arbitration decision would have to be commenced in a new [] action." *Id.* Under such circumstances, like those before us now, we found the "summary judgment ruling finally ended this particular action[,]" and we concluded our jurisdiction was proper under W.R.A.P. 1.05(a). *Id.* ¶¶ 12–13, 98 P.3d at 162.

[¶13] Conversely, in *Dennis v. Jack Dennis Sports, Inc.*, 2011 WY 96, 253 P.3d 495 (Wyo. 2011), we dismissed for lack of jurisdiction the appeal of an order compelling arbitration where the underlying action had been stayed. We gave plain meaning to the limited list of appealable orders under Wyo. Stat. Ann. § 1-36-119(a), and determined the stay prevented the order compelling arbitration from being final and appealable under W.R.A.P. 1.05. *Dennis*, ¶¶ 4–6, 253 P.3d at 495–96. Under *Scherer* and *Dennis* then, W.R.A.P. 1.05(a) permits our review of an order compelling arbitration where the underlying action has been dismissed, but if the underlying action has been stayed, we must dismiss a direct appeal for lack of jurisdiction. *Scherer* does not, however, license a dismissal in disregard of the Uniform Arbitration Act. The parties in *Scherer* apparently did not raise that issue, but Ms. Inman has raised it here.

[¶14] With that issue now before us, we conclude the arbitration act in Wyoming (and Utah) clearly mandates that the court must stay the underlying action when it orders the

4

parties to arbitrate. *See* Wyo. Stat. Ann. § 1-36-104(c) ("Any action or proceeding involving an issue subject to arbitration **shall be stayed** if an order for arbitration or an application therefor has been made or, if the issue is severable, the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration shall include such stay.") (emphasis added); Utah Code Ann. § 78B-11-108(7) ("If the court orders arbitration, the court on just terms **shall stay** any judicial proceeding that involves a claim subject to the arbitration. If a claim subject to the arbitration is severable, the court may limit the stay to that claim.") (emphasis added); *see also Mariposa Exp., Inc. v. United Shipping Sols., LLC*, 2013 UT App 28, ¶ 19, 295 P.3d 1173 (concluding "the district court should have stayed the action [pursuant to Utah Code Ann. § 78B-11-108(7)] rather than dismiss the Mariposa franchisees' complaint after it ordered the parties to arbitrate their dispute").[3] Accordingly, we must hold that the district court erred when it dismissed Ms. Inman's legal malpractice action.

[¶15] To avoid similar future mistakes it is incumbent on parties seeking to compel arbitration to give careful attention to the procedures set forth in the Act. A party seeking to compel arbitration should simply move the court to do so. The court may then proceed to summarily consider the issue of arbitrability, taking evidence as it may deem necessary. If the court orders arbitration, it shall then stay the underlying action in accordance with Wyo. Stat. Ann. § 1-36-104(c), either on its own motion or on the motion of one or more of the parties. No party should put the district court between a rock and a hard place by filing a motion to dismiss the action underlying its motion to compel arbitration.

[¶16] We acknowledge that compliance with the Act's stay mandate will foreclose future litigants from directly appealing an order compelling arbitration. *See Dennis*, ¶¶ 2-8, 253 P.3d at 495–97. Compliance does not, however, leave parties without a potential avenue for timely appellate review. Once an underlying action is stayed pending arbitration, a party may request discretionary interlocutory review of an order compelling arbitration under W.R.A.P. 13. *See Miller*, ¶ 1, 478 P.3d at 166 (reversing an order to compel arbitration that came to this Court on a petition for writ of review); W.R.A.P. 13.01(a) ("Granting of a petition is within the discretion of the supreme court."); W.R.A.P. 13.02 (allowing interlocutory review of an order "which involves a controlling question of law as to which there are substantial bases for difference of opinion" and "in which an immediate appeal . . . may materially advance resolution of the litigation"). Appellate

---

[3] The stay serves several purposes. *See, e.g.*, *Scherer*, ¶ 12, 98 P.3d at 162 (a stay allows the court to "maintain oversight authority over the" arbitration process); *Meyer v. Dans un Jardin, S.A.*, 816 F.2d 533, 538–39 (10th Cir. 1987) (a stay allows the court, through "continuing supervision[,] . . . to ensure that arbitration proceedings are conducted within a reasonable period of time, thus preventing any impairment of the plaintiffs' rights to seek relief"); *Napier v. Epoch Corp.*, 971 A.2d 594, 598 (R.I. 2009) (a stay "avoid[s] any complications that could arise if duplicative proceedings progressed simultaneously"); *Franco v. Arakelian Enterprises, Inc.*, 234 Cal.App.4th 947, 966, 184 Cal.Rptr.3d 501, 516–17 (2015) (a stay "preserve[s] the status quo until the arbitration is resolved, preventing any continuing trial court proceedings from disrupting and rendering ineffective the arbitrator's jurisdiction to decide the issues that are subject to arbitration"); *Lifecell Corp. v. Carver*, No. SA-14-CV-152-XR, 2014 WL 12586857, at *1 (W.D. Tex. July 11, 2014) (a stay allows the court "to ensure that any arbitration award is enforced").

review in accordance with W.R.A.P. 13 provides an avenue for parties to save the time and expense of arbitration where the agreement to arbitrate may be unenforceable.[4]  *C.f. Scherer*, ¶ 13, 98 P.3d at 162.

### Scope of the Arbitrability Ruling

[¶17]  The court's duty when a party moves to compel arbitration is statutorily prescribed:

> On application of a party showing an arbitration agreement and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration.  If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to determine the issue raised and shall order or deny arbitration accordingly.

Wyo. Stat. Ann. § 1-36-104(a); *see* Utah Code Ann. § 78B-11-108(1)(b) ("On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement: . . . if the refusing party opposes the motion, the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate.").

[¶18]  While Ms. Inman's malpractice complaint against Grimmer was pending in the Third Judicial District Court in Wyoming, Grimmer moved to compel arbitration, showing the parties had agreed to arbitrate "[a]ny dispute arising out of, in connection with, or in relation to the interpretation, performance or breach of [their engagement agreement]— including any claim of legal malpractice[.]"  Ms. Inman refused arbitration, claiming the engagement agreement and the arbitration provision were unenforceable.  In accordance with the statute, the district court concluded the arbitration provision was enforceable, which made the engagement agreement arbitrable.  The court then left the question of the enforceability of the engagement agreement to the arbitrator.

[¶19]  Ms. Inman suggests the court was obliged to rule on the engagement agreement's enforceability before ordering arbitration.  Though neither Wyoming nor Utah courts have directly ruled on this issue, we are guided by the United States Supreme Court's interpretation of statutory language substantially similar to Wyoming's and Utah's arbitrations acts, and its adoption of the severability rule.

---

[4] An arbitrability ruling may also be reviewed on appeal of an order confirming or denying confirmation of an award, an order modifying or correcting an award, an order vacating an award without directing a rehearing, or a final judgment or decree entered by the court.  *See* Wyo. Stat. Ann. § 1-36-119(a)(iii)–(vi); Utah Code Ann. § 78B-11-129(1)(c)–(f); *see also Dennis*, ¶ 4, 253 P.3d at 496 (explaining that an appellant can seek review of the final arbitration decision, and raise the issue of "whether the trial court was right in referring the case to arbitration" then. (quoting *Chem-Ash, Inc. v. Arkansas Power & Light Co.*, 296 Ark. 83, 751 S.W.2d 353, 354 (1988)); *Powell v. Cannon*, 2008 UT 19, ¶¶ 19–21, 179 P.3d 799.

[¶20]  Section 2 of the Federal Arbitration Act states that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Wyoming and Utah acts similarly mandate that a written arbitration agreement is "valid, enforceable, and irrevocable" "save upon such grounds as exist at law or in equity for the revocation of the contract."  Wyo. Stat. Ann. § 1-36-103 ("A written agreement to submit any existing or future controversy to arbitration is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of the contract."); *see* Utah Code Ann. § 78B-11-107(1) ("An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.").

[¶21]  In a line of cases beginning with *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court has interpreted this "substantive command that arbitration agreements be treated like all other contracts" to give rise to the rule of severability.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 447, 126 S.Ct. 1204, 1209, 163 L.Ed.2d 1038 (2006); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70–71, 130 S.Ct. 2772, 2778, 177 L.Ed.2d 403 (2010); *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 301, 130 S.Ct. 2847, 2858, 177 L.Ed.2d 567 (2010).  This rule mandates that "an arbitration provision is severable from the remainder of the contract." *Buckeye*, 546 U.S. at 445, 126 S.Ct. at 1209. In other words, the agreement to arbitrate stands separate from the contract, and if the court determines the arbitration agreement is valid, then the contract is arbitrable, and any challenge to the rest of the contract, as long as it is within the scope of the arbitration provision,[5] must be submitted to the arbitrator.  *See id.* at 445–46, 126 S.Ct. at 1209; *Rent-A-Center*, 561 U.S. at 70, 130 S.Ct. at 2778 (explaining that "because § 2 states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained . . . a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate").

[¶22]  The Utah arbitration act plainly supports the district court's submission of Ms. Inman's challenge to the enforceability of the engagement agreement to the arbitrator, as Utah has adopted the express language of § 6(c) of the Uniform Arbitration Act.  As revised in 2000, Uniform Arbitration Act § 6(c) expressly provides that "[a]n arbitrator shall decide whether . . . a contract containing a valid agreement to arbitrate is enforceable."  Unif. Arbitration Act § 6(c) (amended 2000).  The comments to the revised act explain that this language "is intended to follow the 'separability' doctrine outlined in *Prima Paint*[,]" which "[a] majority of States recognize some form of . . . under their state arbitration laws."  Unif. Arbitration Act § 6, cmt. 4.  *See* Utah Code Ann. § 78B-11-107 ("(2) The court shall

---

[5] Ms. Inman does not challenge that her malpractice claims are within the scope of the arbitration provision.

decide whether an agreement to arbitrate exists . . . (3) An arbitrator shall decide . . . whether a contract containing a valid agreement to arbitrate is enforceable.").

[¶23]   Wyoming has not adopted the revised Uniform Arbitration Act.  However, because Wyo. Stat. Ann. § 1-36-103, like § 2 of the Federal Arbitration Act, addresses the validity and enforceability of "[a] written agreement to submit" a controversy to arbitration "*without mention* of the validity of the contract in which it is contained[,]" *Rent-A-Center*, 561 U.S. at 70, 130 S.Ct. at 2778, we too will follow the majority of states and recognize that an arbitration provision is severable from the remainder of the contract.[6]  We therefore hold that the district court properly applied both Utah's and Wyoming's arbitration statutes when, after identifying that Ms. Inman challenged both the engagement agreement and the arbitration provision, it limited its review to the enforceability of the arbitration provision. It correctly left the question of the engagement agreement's enforceability to the arbitrator.

### Enforceability of the Arbitration Provision

[¶24]   Finally, we address Ms. Inman's argument the arbitration provision is unenforceable because it is unconscionable and violates public policy.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011) (explaining that arbitration agreements are susceptible to "generally applicable contract defenses, such as fraud, duress, or unconscionability").  On this wholly substantive issue, we honor the parties' choice of law and apply Utah law.  *See Denbury*, ¶ 24, 476 P.3d at 1105.

[¶25] Utah courts use a two-pronged analysis for determining unconscionability. *Commercial Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 42, 285 P.3d 1193 (citing *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998)).  The first prong, substantive unconscionability, "focuses on the contents of an agreement, examining the relative fairness of the obligations assumed[,]" and the second prong, procedural unconscionability, "focuses on the negotiation of the contract and the circumstances of the parties."  *Id.* ¶¶ 43–44 (quoting *Ryan*, 972 P.2d at 402–03).  In *Sosa v. Paulos*, the Utah Supreme Court stated unconscionability occurs where there is "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  924 P.2d 357, 360 (Utah 1996) (quoting *Res. Mgmt. Co. v. Weston Ranch and Livestock Co., Inc.*, 706 P.2d 1028, 1043 (Utah 1985)).  The Court also explained that it would be rare to find an arbitration agreement unconscionable without any substantive imbalance in the parties' obligations.  *Id.* at 361 (citing *Res. Mgmt.*, 706 P.2d at 1043).

---

[6] *Fox v. Tanner*, 2004 WY 157, 101 P.3d 939 (Wyo. 2004), discussed a perceived tension between earlier Supreme Court cases and cited a now-outdated scholarly commentary to seemingly question the long-term viability of the severability rule.  *Rent-A-Center*, 561 U.S. at 70–71, 130 S.Ct. at 2778, clearly resolved any tension and reinforced the continued applicability of the severability rule.  Moreover, the discussion in *Fox* was dicta, as *Fox* did not address the severability issue before us here.  *Fox*, therefore, does not support any notion that district courts should decide the enforceability of the entire contract on a motion to compel arbitration.

[¶26]  Ms. Inman contends both unconscionability prongs are met, claiming the agreement unreasonably favors Grimmer and she lacked meaningful choice in entering into it.  We first evaluate her claim concerning the substantive prong.  When determining whether a contract is substantively unconscionable, Utah courts "consider whether a contract's terms are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain according to the mores and business practices of the time and place."  *Commercial Real Estate*, ¶ 44 (citation omitted).  Ms. Inman asserts there was an imbalance in the rights given up under the arbitration provision.  She claims that while she gave up the right to have substantive malpractice claims tried by a court, Grimmer has only forgone this right in fee disputes.  The language of the arbitration provision does not support this claimed inequity.

[¶27]  Under the express terms of the provision, "[a]ny dispute arising out of, in connection with, or in relation to the interpretation, performance or breach of [their engagement agreement]—including any claim of legal malpractice (or similar claim) and any claim involving fees or expenses—shall be resolved by final and binding arbitration[.]"  The provision specifically includes malpractice claims and fee disputes within its scope, but it does not differentiate the parties' arbitrable claims as Ms. Inman suggests.  Any dispute related to the engagement agreement is subject to arbitration.

[¶28]  The provision goes on to specifically reference Ms. Inman's acknowledgement that she was waiving the right to a jury trial, broad appellate review, and broad discovery by signing the agreement:

> Client further acknowledges that, by so agreeing, Client waives the right to a jury trial.  Client also acknowledges that arbitration provides only limited discovery and that courts will enforce an award in arbitration without reviewing it for errors of fact or law.

However, that language does not inequitably subject Ms. Inman's claims to arbitration or limit the scope of arbitration as to Grimmer's claims.  Rather, it clarifies for Ms. Inman, the client, the result of her agreeing to arbitration.  Thus, reading the provision as a whole, both parties effectively gave up the right to have their claims heard by the courts in any and all matters either expressly mentioned—such as malpractice claims and fee disputes— or found to be within the scope of the arbitration provision.[7]  The terms do not unfairly favor Grimmer, and the arbitration provision is not substantively unconscionable.

---

[7] The ABA Committee on Ethics and Professional Responsibility has opined that attorneys may include a provision in an engagement agreement that requires the client to submit malpractice claims to arbitration, provided the client is adequately informed of the existence and effect of the provision.  ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 02–425 (2002).  We address the relevance of this opinion in the public policy discussion at ¶¶ 34–37.

9

[¶29]  Turning to the procedural prong, we examine whether this is one of those rare cases in which the arbitration provision should be deemed unconscionable on that prong alone. *See Sosa*, 924 P.2d at 361.  The facts Ms. Inman asserts in support of her procedural unconscionability claim are: she had relied on and trusted Grimmer as more than just an attorney for several years prior to signing the new agreement; no one accompanied her when she met with Grimmer to sign the new agreement only weeks after she turned 18; and Grimmer never explained to her that the new agreement contained an arbitration provision, that she was giving up certain rights by agreeing to the arbitration provision, or that she could have another attorney review the agreement.  These circumstances, she posits, put Grimmer in a position of superior bargaining power such that she lacked meaningful choice in signing the agreement.

[¶30]  The key inquiry in a procedural unconscionability analysis is "whether there was overreaching by a contracting party occupying an unfairly superior bargaining position." *Commercial Real Estate*, ¶ 43 (citation omitted).

> Factors bearing on procedural unconscionability include (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Sosa*, 924 P.2d at 362 (internal citations omitted).

[¶31]  Applying these factors to Ms. Inman's sworn affidavit and other record evidence in support of and in opposition to unconscionability, we first note the absence of any evidence that Ms. Inman was unable to understand the arbitration provision, or that she lacked capacity to enter the agreement.[8]  Though her affidavit claims she would not have signed the agreement if she knew what it meant, or knew what rights she was giving up, she does not aver or otherwise demonstrate she lacked a reasonable opportunity to understand the terms and conditions of the agreement, or to engage in meaningful negotiation over the terms.  She does not assert that Grimmer engaged in deceptive practices to obscure the arbitration provision.  Indeed, the provision, including the rights she waived by signing,

---

[8] We note, as the district court did, there is a passing reference in the record to the fact that Ms. Inman may have been diagnosed with fetal alcohol syndrome.  On appeal, Ms. Inman makes no mention of this point in conjunction with her capacity to enter into the agreement, nor does she argue it in any other context.  We therefore will not consider it.

10

was plainly set out in clear, understandable language on the third page of the four-page contract. *See McBroom v. Child*, 2016 UT 38, ¶ 22, 392 P.3d 835 ("Each party has the burden to understand the terms of a contract before [s]he affixes [her] signature to it and may not thereafter assert [her] ignorance as a defense." (quoting *Res. Mgmt.*, 706 P.2d at 1047)). Though she explains how she came to rely on Grimmer, she does not demonstrate how that reliance or relationship rendered her powerless, or deprived her of a meaningful choice in signing the agreement. While we recognize the possibility of overreaching—Grimmer drafted, but did not draw attention to or explain the arbitration provision to its 18-year-old client who had been dependent on the firm for many years—we cannot conclude this possibility rises to the level of procedural unconscionability necessary to find the provision unconscionable on that prong alone.

[¶32] Ms. Inman's situation is distinguishable from that of the medical malpractice plaintiff in *Sosa*. Ms. Sosa was presented an arbitration agreement by medical staff minutes before going into knee surgery when she was "in a state of fear and anxiety." *Sosa*, 924 P.2d at 359, 363. She said "she felt 'rushed and hurried' to sign the documents and thus did not read them." *Id.* at 363. Despite the fact that Dr. Paulos drafted the agreement and was clearly in a position of stronger bargaining power, neither he nor any of his medical staff discussed the arbitration agreement with her and no one explained to her the option of not signing or of further discussing it with Dr. Paulos himself. *Id.* Because she was mere minutes from surgery, the Court found that Ms. Sosa likely felt she had no meaningful choice but to sign the agreement. *Id.* On these facts, the Court concluded that Dr. Paulos' behavior was procedurally unconscionable.[9] *Id.* at 364.

[¶33] Despite also finding substantive unconscionability in the arbitration agreement, the Utah Supreme Court found *Sosa* "extremely close on its facts." *Id.* at 359. The facts here are not as close. First, unlike *Sosa*, the arbitration provision is not substantively unconscionable. On the procedural prong, Ms. Inman does not assert she was fearful or anxious, or that she felt rushed to sign the agreement when she met with Grimmer. Equally important, Ms. Inman, unlike Ms. Sosa, actually met with Grimmer before she signed the agreement, which provided her some opportunity to ask questions, negotiate, and discuss its terms. As explained above, the fact that there existed an unusually close relationship between Ms. Inman and Grimmer that fostered her trust and reliance on the firm does not on its own give rise to a finding of procedural unconscionability sufficient to render the arbitration agreement unconscionable.

[¶34] Ms. Inman further argues the arbitration provision is void as against public policy. In *Whittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶¶ 23–24, 469 P.3d 1035, the Utah Supreme Court explained that agreements are void as against public policy where (1) legal precedent has declared the type of agreement at issue unlawful and (2) the agreement is

---

[9] Ultimately, however, due to the inclusion of a revocation clause, which allowed Ms. Sosa to unilaterally revoke the arbitration agreement within 14 days after the surgery, the Court remanded for factual findings as to whether Ms. Sosa was provided a signed copy of the agreement after her surgery, and whether she was precluded in any way from exercising the revocation clause. *Id.* at 363–65.

harmful to the public as a whole—not just to an individual. Yet, Ms. Inman does not argue either of these bases as grounds to invalidate the arbitration provision. We found no Utah law declaring it unlawful to include malpractice claims in an arbitration provision in a legal engagement agreement. In fact, Utah R. Prof. Conduct 1.8 expressly permits such provisions. *See* Utah R. Prof. Conduct 1.8 comment [14] (providing that lawyers may enter into agreements with clients "to arbitrate legal malpractice claims, provided such agreements are enforceable and the client is fully informed of the scope and effect of the agreement"). Similarly, as noted above, the ABA has provided that attorneys may utilize such provisions. *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 02–425 (2002). And other jurisdictions have condoned this practice under various circumstances. *See Hodges v. Reasonover*, 2012-0043 (La. 7/2/12), 103 So.3d 1069; *Castillo v. Arrieta*, 2016-NMCA-040, 368 P.3d 1249; *Snow v. Berstein, Shur, Sawyer & Nelson LLC*, 2017 ME 239, 176 A.3d 729; *Delaney v. Dickey*, 244 N.J. 466, 242 A.3d 257 (2020); *Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W.3d 494 (Tex. 2015); *Innovative Images, LLC v. Summerville*, 309 Ga. 675, 848 S.E.2d 75 (2020); *Johnson, Pope, Bokor, Ruppel & Burns, LLP v. Forier*, 67 So.3d 315 (Fla. Dist. Ct. App. 2011).

[¶35] Ms. Inman instead argues the arbitration provision violates public policy because Grimmer did not verbally explain it to her, and because Grimmer never obtained her informed consent to waive the conflict of interest created by Grimmer's dual representation of her and Patterson as required under the rules of professional conduct.

[¶36] According to Ms. Inman, an attorney has a duty to verbally explain an arbitration provision in an engagement agreement to a client and the failure to do so invalidates the provision. She provides no Utah law in support of her claim. Instead she cites to cases from Louisiana and New Mexico. *See Hodges*, 2012-0043, 103 So.3d 1069; *Castillo*, 2016-NMCA-040, 368 P.3d 1249. *Hodges* and *Castillo*, like the above referenced ABA opinion, require that the client be provided enough information to give informed consent to the arbitration provision. *See Hodges*, 2012-0043, p. 14, 103 So.3d at 1078 ("an attorney must make full and complete disclosure of the potential effects of an arbitration clause"); *Castillo*, 2016-NMCA-040, ¶ 23, 368 P.3d at 1257 ("if an attorney is going to require his client, within the context of their relationship of trust, to [agree to arbitrate] a future malpractice dispute, such [an agreement] should be made knowingly with the client's informed consent"). However, neither case stands for the proposition that an attorney must verbally explain an arbitration provision. To the contrary, each case suggests that the written clause itself may sufficiently inform the client. *See Hodges*, 2012-0043, p. 13, 103 So.3d at 1078 ("[t]he arbitration clause did not specifically enumerate the types of disputes it was meant to cover, including malpractice claims"); *Castillo*, 2016-NMCA-040, ¶ 24, 368 P.3d at 1257 ("Here, the text of the clause itself is no help. It declares in a single sentence only that client and attorney agree to submit 'any dispute' to arbitration.").

[¶37] Because the duty to obtain informed consent derives from rules of professional responsibility, *see Hodges*, 2012-0043, p. 11, 103 So.3d at 1077 (relying in part on Louisiana rule 1.4(b)); *Castillo*, 2016-NMCA-040, ¶ 22, 368 P.3d at 1257 (citing to New

12

Mexico rule 16–104(B)), we look to the Utah rules to determine whether a verbal explanation is required. As noted above, Utah R. Prof. Conduct 1.8 comment [14] affirms that lawyers may enter into agreements with clients "to arbitrate legal malpractice claims, provided such agreements are enforceable and the client is fully informed of the scope and effect of the agreement." The rules nowhere suggest that in order to ensure the client is fully informed, an attorney must verbally explain the arbitration provision. And Ms. Inman does not argue that the written provision alone was insufficient to fully inform her of its scope and effect. The provision clearly covered malpractice claims, and plainly listed the rights Ms. Inman relinquished when she signed the agreement. In the end, the law and rules of professional conduct permit attorneys to include arbitration provisions that encompass malpractice claims in their engagement agreements; Ms. Inman does not claim the arbitration provision is harmful to the public as whole; Grimmer had no duty under Utah law or rules of professional conduct to verbally explain the provision to her; and the provision as written was adequate to inform her of its scope and effect. Under these circumstances, Ms. Inman has not convinced us that Utah courts would invalidate the arbitration provision on public policy grounds.

[¶38]  In her second public policy argument, Ms. Inman asserts the arbitration provision is unenforceable because Grimmer's improper concurrent representation of both her and Patterson without her informed consent invalidates the engagement agreement. This argument embodies her challenge to the enforceability of the engagement agreement, which we leave to the arbitrator to resolve. *See* ¶¶ 17–23.

## *CONCLUSION*

[¶39]  For the foregoing reasons, we conclude the district court properly limited the scope of its arbitrability ruling to address only the enforceability of the arbitration provision, and we affirm that ruling. However, because the court erred when it dismissed Ms. Inman's legal malpractice action upon ordering arbitration, we reverse and remand with instructions to stay the action pending final arbitration.